Nina JORDAN; Susan Bagley; Sharon Hanson; Sandra Entz; Yvonne Wood, Plaintiffs–Appellees,

v.

Booth GARDNER; Chase Riveland; Lawrence Kincheloe, Warden; Eldon Vail; Richard Alfresio, Defendants–Appellants,

and

Washington State Corrections Employees Association, Defendant–Intervenor.

Nina JORDAN; Susan Bagley; Sharon Hanson; Sandra Entz; Yvonne Wood, Plaintiffs–Appellees,

v.

Booth GARDNER; Chase Riveland; Lawrence Kincheloe, Warden; Eldon Vail, Defendants–Appellants,

and

Washington State Corrections Employees Association, Defendant–Intervenor.

Nos. 90–35307, 90–35552.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 27, 1992.

Decided Feb. 25, 1993.

Kathleen D. Mix, Asst. Atty. Gen., Olympia, WA, for defendants-appellants.

Timothy K. Ford, MacDonald, Hoague & Bayless, Seattle, WA, for plaintiffs-appellees.

Before: WALLACE, Chief Judge, POOLE, CANBY, REINHARDT, HALL, WIGGINS, NOONAN, O'SCANNLAIN, LEAVY, TROTT, and KLEINFELD, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

█ The Governor of Washington and officials of the Washington Corrections Center for Women ("WCCW") appeal from the district court's order enjoining them from implementing a policy that requires male guards to conduct random, non-emergency, suspicionless clothed body[1] searches on female prisoners. The district court found that such policy violates the female prisoners' First, Fourth, and Eighth Amendment rights. We vacate our earlier three-judge panel decision, *Jordan v. Gardner*, 953 F.2d 1137, *reh'g en banc granted*, 968 F.2d 984 (9th Cir.1992), which reversed the district court. Sitting en banc, we now affirm the district court on Eighth Amend-

---

1. The WCCW officials euphemistically refer to these searches as "pat-down" searches. However, as discussed *infra* at 1523, the evidence showed that these searches involved not "patting" but rather motions that are more accurately described as "rubbing," "squeezing," and "kneading." We will follow the lead of the district court and decline to refer to the searches as "pat-down" searches in favor of the neutral description "cross-gender clothed body" searches.

ment grounds and do not reach the inmates' other constitutional claims.

## I

The WCCW is an all-female prison which, in December of 1989, housed approximately 270 convicted felons. The inmates are classified at the minimum, medium, and maximum security levels. Since its opening in 1971, both male and female guards have staffed the institution. Before mid–1989, routine, suspicionless searches of inmates were performed only at fixed checkpoints by female guards. Male guards were permitted to search inmates only in emergency situations.

In late 1988, members of the correctional staff filed a grievance against the same-gender search policy at the institution. The female guards were unhappy that their meal breaks, taken while they were still officially on duty, were occasionally interrupted to conduct searches at the fixed checkpoints. The Washington Department of Corrections ("DOC") denied the first level grievance.

In January 1989, Eldon Vail took over as the new WCCW Superintendent. Vail believed that the prison's policy of conducting suspicionless searches only at fixed checkpoints was ineffective in controlling the movement of contraband through the facility, and decided to institute a policy of random searches. He was concerned, however, that to order an increase in the number of searches performed, while retaining the policy that only female guards could perform them, would lead to additional grievances and an eventual lawsuit by the female guards. On February 26, 1989, after consultation with the Director of the DOC, Superintendent Vail decided to change the policy at the institution and to order routine cross-gender clothed body searches of WCCW inmates. Despite warnings from psychologists on his staff that the cross-gender clothed body searches could cause severe emotional distress in some inmates,

Vail instituted the policy which became effective on July 5, 1989.

During the cross-gender clothed body search, the male guard stands next to the female inmate and thoroughly runs his hands over her clothed body starting with her neck and working down to her feet. According to the prison training material, a guard is to "[u]se a flat hand and pushing motion across the [inmate's] crotch area." WCCW, *Pat–Down Searches of Female Inmates* (n.d.). The guard must "[p]ush inward and upward when searching the crotch and upper thighs of the inmate." *Id.* All seams in the leg and the crotch area are to be "squeez[ed] and knead[ed]." *Id.* Using the back of the hand, the guard also is to search the breast area in a sweeping motion, so that the breasts will be "flattened." *Id.* Superintendent Vail estimated that a typical search lasts forty-five seconds to one minute. A training film, viewed by the court, gave the impression that a thorough search would last several minutes. At a minimum, each response and movement officer was expected to perform ten random searches per shift during the two daytime shifts.

Several inmates were searched by male guards on the first (and only) day of implementation. One, who had a long history of sexual abuse by men, unwillingly submitted to a cross-gender clothed body search and suffered severe distress: she had to have her fingers pried loose from bars she had grabbed during the search, and she vomited after returning to her cell block.[2] Later that day, the inmates filed this civil rights action under 42 U.S.C. § 1983 and obtained a preliminary injunction, which was later transformed into a permanent injunction. Random cross-gender clothed body searches have not been performed at the WCCW since that day, July 5, 1989.

The district court issued its order permanently enjoining the searches following a seven-day trial. The record includes over 1000 pages of trial testimony transcripts, about 300 court documents, and various

**2.** This inmate later settled a suit for damages against the guard and prison officials for $1000 plus $10,000 in attorneys' fees.

exhibits including videotapes. Before reaching his decision, Judge Bryan heard six days of live testimony, reviewed eight written or videotaped depositions, and received fifty-six exhibits.

## II

The inmates first contend that the search policy violates the Fourth Amendment.[3] The Fourth Amendment guarantees the right of the people to be secure against unreasonable searches, and its protections are not extinguished upon incarceration. *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir.1988). Judge Reinhardt's concurring opinion ably articulates the Fourth Amendment analysis developed by *Bell v. Wolfish*, 441 U.S. 520, 558–60, 99 S.Ct. 1861, 1884–85, 60 L.Ed.2d 447 (1979),. and *Turner v. Safley*, 482 U.S. 78, 87–91, 107 S.Ct. 2254, 2260–62, 96 L.Ed.2d 64 (1987). We do not decide, however, whether the search policy violates the Fourth Amendment, because we conclude that the Eighth Amendment prohibition against the unnecessary and wanton infliction of pain forbids these searches under the circumstances of this case. We address the Fourth Amendment issue only to clarify our reasons for not deciding the case on that basis.

We agree that the conduct at issue plainly is a "search" that implicates the protections of the Fourth Amendment. Consequently, Judge Reinhardt's contention that we should decide this case on the basis of the Fourth Amendment, because a search reasonable under the Fourth Amendment "cannot, by definition," violate the Eighth Amendment, has surface appeal. Its fallacy lies in the failure to pinpoint precisely which legitimate Fourth Amendment interest is violated by these searches. Judge Reinhardt avoids the issue by simply presuming the inmates possess rights that are invaded by these searches. He proceeds directly to the *Turner* analysis of whether the search policy is valid, as reasonably related to legitimate penological interests, without examining how the inmates' Fourth Amendment rights are infringed.

■ Whether such rights exist—whether the inmates possess privacy interests that could be infringed by the cross-gender aspect of otherwise constitutional searches— is a difficult and novel question, and one that cannot be dismissed lightly. But we cannot assume from the fact that the searches cause immense anguish that they therefore violate protected Fourth Amendment interests. Far from it, our prior case law suggests that prisoners' legitimate expectations of bodily privacy from persons of the opposite sex are extremely limited. *See Grummett v. Rushen*, 779 F.2d 491, 495–96 (9th Cir.1985) (pat-down searches of male inmates that included groin area by female guards do not violate Fourth Amendment); *Michenfelder*, 860 F.2d at 334 (occasional visual strip searches of male inmates by female guards do not violate Fourth Amendment). The frequency and scope of the searches in *Grummett* and *Michenfelder* were significantly less invasive than the searches at issue here, and hence those cases are not controlling. Most importantly, however, the prisoners in those cases rested their claims upon invasions of privacy. The gravamen of the inmates' charge here is that the cross-gender clothed body searches inflict great pain and suffering. The unnecessary and wanton infliction of pain upon prisoners constitutes cruel and unusual punishment forbidden by the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (quotations omitted).

Although the inmates here may have protected privacy interests in freedom from

---

3. The inmates also contend that the cross-gender clothed body searches violate the First Amendment, in that some of them have religious objections to intimate contact by men not their husbands. Although the First Amendment is the "more 'explicit textual source of constitutional protection'" of free exercise of religion, *see Soldal v. Cook County*, —— U.S. ——, ——, 113 S.Ct. 538, 548, 121 L.Ed.2d 450 (1992) (quot-

ing *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989)), the Fourth and Eighth Amendments more directly regulate the conduct at issue— searching, and inflicting pain and suffering— and affect a much larger part of the inmate population. Since we affirm the district court on the basis of the Eighth Amendment, we do not reach the First Amendment claims.

cross-gender clothed body searches, such interests have not yet been judicially recognized. On the other hand, the Eighth Amendment right of incarcerated persons to be free from the unwarranted infliction of pain is clearly established. As both amendments are applicable, and we affirm the district court upon the basis of the Eighth Amendment, we do not reach the Fourth Amendment claims.

## III

" 'After incarceration, only the "unnecessary and wanton infliction of pain" ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.' " *Whitley v. Albers*, 475 U.S. at 319, 106 S.Ct. at 1084 (quoting *Ingraham v. Wright*, 430 U.S. 651, 670, 97 S.Ct. 1401, 1412, 51 L.Ed.2d 711 (1977), in turn quoting standard originally described in *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (internal citation omitted)). Under traditional Eighth Amendment analysis, we first consider whether there is an "infliction of pain," and, if so, whether that infliction is "unnecessary and wanton."

## A

The district court made a number of findings of fact on the issue of pain. Noting that many of the inmates at WCCW have histories of sexual or physical abuse by men, the district court found that physical, emotional, and psychological differences between men and women "may well cause women, and especially physically and sexually abused women, to react differently to searches of this type than would male inmates subjected to similar searches by women." Findings of Fact & Conclusions of Law at 3, *Jordan v. Gardner*, No. C89–339TB (W.D.Wash. Feb. 28, 1990) (hereinafter "Findings & Conclusions") (¶ 6). The district court found that "[t]here is a high probability of great harm, including severe psychological injury and emotional pain and suffering, to some inmates from these

searches, even if properly conducted." *Id.* (¶ 8). This finding was buttressed by testimony regarding the inmate witnesses' personal histories, which the court found to be credible. *Id.* (¶ 7).

The record in this case, including the depositions of several inmates and the live testimony of one, describes the shocking histories of verbal, physical, and, in particular, sexual abuse endured by many of the inmates prior to their incarceration at WCCW. For example, S.H.,[4] who gave live trial testimony, described rapes by strangers (twice) and by husbands or boyfriends. She described how she had been beaten by various men in her life. Two deprived her of adequate food; one pushed her out of a moving car. S.H.'s story is not unique. Eighty-five percent of the inmates report a history of serious abuse to WCCW counselors, including rapes, molestations, beatings, and slavery.

Another inmate, K.D., testified by deposition that her second husband beat her, strangled her, and ran over her with a truck. As T.D., another inmate, grew up, she was frequently strapped or handcuffed to a bed by her half-brother, who beat or raped her; T.D.'s mother told her that there was nothing wrong with her half-brother's conduct. T.D.'s mother once directed her to masturbate her stepfather, and in her later teens T.D. was pushed into sexual liaisons by her mother, who would then blackmail the men. Another inmate's hand was broken by one of her two wife-beating husbands. Another, S.E., was sixteen when her uncle impregnated her; after the failure of the uncle's attempts to induce an abortion using a broom handle, screwdriver, bleach, and Lysol, the uncle paid a man to marry her. During that marriage, S.E. was frequently raped by her husband and his friends, one time ending up in the hospital after they beat her and "ripped [her] behind."

The inmates presented testimony from ten expert witnesses on the psychological impact of forced submission to these

---

4.  In keeping with the tradition of not revealing names of the victims of sexual assault, we use

initials here to protect the privacy of the inmates.

searches by male guards, and related issues. The experts included WCCW staff members, social workers, psychologists, an anthropologist, and the former Director of Corrections for four different states at various times. The testimony described the psychological fragility of and disorders found in abused women. A psychologist specializing in psychotherapy for women testified that the unwilling submission to bodily contact with the breasts and genitals by men would likely leave the inmate "revictimiz[ed]," resulting in a number of symptoms of post-traumatic stress disorder. Although there was some expert testimony that expressed uncertainty as to the magnitude of the harm suffered by the inmates, the inmates' experts, many of whom were employed by WCCW, were unanimously of the view that some would suffer substantially. This conclusion was corroborated by the inmates' own testimony and the disastrous results of the cross-gender clothed body search of S.H.

On appeal we look for clear error. Only if we are " 'left with the definite and firm conviction that a mistake has been committed,' " *United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc) (quoting *Pullman–Standard v. Swint,* 456 U.S. 273, 284–85 n. 14, 102 S.Ct. 1781, 1787–88, 72 L.Ed.2d 66 (1982)), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), may we overturn facts found by the district court. The prison officials' challenge that such findings are clearly erroneous must fail.

We are satisfied that the constitutional standard for a finding of "pain" has been met in this case. In most of our other search cases, the court has not been presented with evidence pointing to more than momentary discomfort caused by the search procedures. For example, in *Grummett v. Rushen,* 779 F.2d 491 (9th Cir.

1985), this court considered the constitutionality of pat searches performed by female guards on male prisoners. We concluded that the inmates had not shown sufficient evidence of pain to make out a cognizable Eighth Amendment claim. *Id.* at 493 n. 1. Nothing in *Grummett* indicates that the men had particular vulnerabilities that would cause the cross-gender clothed body searches to exacerbate symptoms of pre-existing mental conditions. Indeed, in contrast to this case, nothing in *Grummett* indicates that the male prisoners had experienced or would be likely to experience any psychological trauma as a result of the searches.

The record in this case supports the postulate that women experience unwanted intimate touching by men differently from men subject to comparable touching by women. Several witnesses, including experts in psychology and anthropology, discussed how the differences in gender socialization would lead to differences in the experiences of men and women with regard to sexuality.[5] *Grummett* simply is not controlling in this case.

In short, we are satisfied that the cross-gender clothed body search policy constituted "infliction of pain."

### B

Whether the infliction of pain is "unnecessary and wanton" involves an inquiry into the justification for the new cross-gender clothed body search policy and its intent.

### 1

The record reflects, and the district court found, that WCCW's security is not dependent upon cross-gender clothed body searches. The prison officials do not argue that WCCW's security has been impaired in the slightest during the pendency of the

---

5. We do not chart new territory in upholding the district court's finding that men and women may experience unwanted intimate touching by members of the opposite gender differently. In the Title VII context, we concluded:

> [B]ecause women are disproportionately victims of rape and sexual assault, women have a stronger incentive to be concerned with

sexual behavior.... Men, who are rarely victims of sexual assault, may view sexual conduct in a vacuum without a full appreciation of the social setting or the underlying threat of violence that a woman may perceive.

*Ellison v. Brady,* 924 F.2d 872, 879 (9th Cir. 1991) (footnote omitted).

district court's injunctions, preliminary and permanent, which have now been in effect for three years. Although Superintendent Vail's predecessor voiced concerns about internal security and the need for random searches, these concerns have been met by the establishment of random and routine searches by female guards. Superintendent Vail himself confirmed as much at trial.

Nor do cross-gender clothed body searches ensure equal employment opportunities for male guards. The conflict between the right of one sex not to be discriminated against in job opportunities and the other to maintain some level of privacy "has normally been resolved by attempting to accommodate both interests through adjustments in scheduling and job responsibilities for the guards." *Smith v. Fairman*, 678 F.2d 52, 55 (7th Cir.1982), *cert. denied*, 461 U.S. 907, 103 S.Ct. 1879, 76 L.Ed.2d 810 (1983); *see also Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079, 1087 (8th Cir.), *cert. denied*, 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980), *overruled on other grounds, Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). At trial, the prison officials' own witnesses testified that not a single bid had been refused, promotion denied, nor guard replaced as a result of the ban on routine cross-gender clothed body searches.

Although the district court found that the random search policy was "addressed" to security, it also noted that the evidence demonstrated "that the security interests of the [WCCW] have been adequately fulfilled by the actions of its administrative officials, prior to the proposed policy change and during the period in which a preliminary injunction has been in effect in this case." Findings & Conclusions at 6 (¶ 19). It appears that none of the Eighth Amendment cases decided by the Supreme Court, this circuit, or any other court of appeals has upheld a pain-inflicting measure simply because prison officials implemented the policy to "address" a legitimate governmental interest. The district court's conclusion that "[t]he proposed random or routine cross-gender clothed body searches constitute the infliction of pain *without penological justification*, and cruel and unusual punishment in violation of the Eighth Amendment," Findings and Conclusions at 12 (¶ 28) (emphasis added), was entirely consistent with the evidence.[6]

### 2

■ From the discussion above, it is evident that the cross-gender clothed body searches are "unnecessary." The closer question is whether the infliction of pain was "wanton." "Eighth Amendment claims based on official conduct that does not purport to be the penalty formally imposed for a crime require inquiry into [the prison officials'] state of mind...." *Wilson v. Seiter*, — U.S. —, —, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991). "It is obduracy and wantonness ... that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley*, 475 U.S. at 319, 106 S.Ct. at 1084.

■ "[W]antonness does not have a fixed meaning but must be determined with 'due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged.'" *Wilson*, — U.S. at —, 111 S.Ct. at 2326 (quoting *Whitley*, 475 U.S. at 320, 106 S.Ct. at 1084). In determining what constitutes "wantonness," the baseline mental state is deliberate indifference. *Wilson*, — U.S. at

6. The Supreme Court has instructed us that "neither judge nor jury freely [may] substitute their [sic] judgment for that of officials who have made a considered choice." *Whitley*, 475 U.S. at 322, 106 S.Ct. at 1085. By concluding that cross-gender clothed body searches are unjustifiable on this record, Judge Bryan has not violated this stricture. It is difficult to describe the new policy as a "considered choice"; Superintendent Vail noted at trial that he had formulated his policy "[n]ot with anywhere near the amount of knowledge I have at this point" concerning the likely impact on the inmates. *Cf. Tribble v. Gardner*, 860 F.2d 321, 327 n. 9 (9th Cir.1988) ("In view of the substantial evidence that ... defendants have exaggerated their response to purported security considerations, we do not defer to their expert judgment in these matters.") (citations omitted), *cert. denied*, 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989).

————, 111 S.Ct. at 2326–27. Thus, where an inmate alleges that the conditions of confinement inflict unnecessary suffering upon him or her, to establish wantonness the inmate must show only that the prison officials were deliberately indifferent to the inmate's suffering. *Id.* In contrast, when prison officials use force to maintain order, a greater showing is required; in that situation, wantonness turns on " 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *Hudson v. McMillian,* —— U.S. ——, ——, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992) (quoting *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1084). The reasons for this distinction are plain. Whether in the context of a prison-wide disturbance or an individual confrontation between an officer and prisoner, corrections officers often must act immediately and emphatically to defuse a potentially explosive situation. *See, e.g., Williams v. Burton,* 943 F.2d 1572, 1575–76 (11th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992). In such a situation, officers must make difficult judgments whether, and how much, force is appropriate. *Id.* The officer rarely has time for reflection; instead, the decision to use force must be made " 'in haste, under pressure, and frequently without the luxury of a second chance.' " *Hudson,* —— U.S. at ——, 112 S.Ct. at 998 (quoting *Whitley,* 475 U.S. at 320, 106 S.Ct. at 1084). Because the critique of such decisions in hindsight could chill effective action by prison officials, the Supreme Court has held that the higher standard is appropriate.[7]

■ We conclude that in this situation "wantonness" is determined by the deliberate indifference standard. Unlike judgment in the excessive force context, our task is not to critique in hindsight the exercise of judgment of a particular officer on a specific occasion. The cross-gender clothed body search policy was developed over time, with ample opportunity for reflection. Moreover, unlike incidents of excessive force, the cross-gender clothed body search policy does not inflict pain on a one-time basis; instead, as with substandard conditions of confinement, the policy will continue to inflict pain upon the inmates indefinitely. *Cf. Wilson,* —— U.S. at —— n. 1, 111 S.Ct. at 2324 n. 1 ("Undoubtedly deprivations inflicted upon all prisoners are, as a policy matter, of greater concern than deprivations inflicted upon particular prisoners...."). When, as here, officials formulate a policy in circumstances where there are no particular constraints on the officials' decisionmaking process, *see Redman v. County of San Diego,* 942 F.2d 1435, 1442 (9th Cir.1991) (en banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992), and the implementation of the policy will inflict pain upon the inmates on a routine basis, we need not look for a showing of action taken "maliciously and sadistically" before Eighth Amendment protections are implicated.

The record mandates the conclusion that the inmates met their burden of establishing the requisite "deliberate indifference." Superintendent Vail indicated that the policy was not required for security purposes and that he adopted the cross-gender clothed body search policy without a great deal of knowledge about the impact of the searches upon the inmates, *see supra* note 4. Yet long before the policy was actually implemented, Superintendent Vail was urged by members of his own staff not to institute cross-gender clothed body searches due to the psychological trauma which many inmates likely would suffer. Further, once the policy took effect, a court order was necessary to prevent the searches although one of the first inmates

---

7. In holding that the "maliciously and sadistically" standard applies to all allegations of excessive force, the Supreme Court does not require as a threshold matter a finding that an emergency situation, such as a riot or lesser disruption, existed. However, the absence of an emergency may be probative of whether the force was indeed inflicted maliciously or sadistically. *See*

*Hudson,* —— U.S. at ——, 112 S.Ct. at 999 ("In determining whether the use of force was wanton and unnecessary, ... it may also be proper to evaluate the need for application of force ... [and] the threat 'reasonably perceived by the responsible officials.' ") (quoting *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085).

to be searched suffered a severe reaction. Even now, despite ample testimony of the harmful effects of this policy, the prison officials are intent upon reversing the district court injunction. In short, we find that the record supports but one conclusion: the prison officials acted with deliberate indifference as to the harm that the cross-gender clothed body searches were likely to cause. *See Berry v. City of Muskogee*, 900 F.2d 1489, 1498 (10th Cir.1990) (knowledge of risk of harm and failure to act to prevent the harm constitute deliberate indifference); *see also Williams v. Griffin*, 952 F.2d 820, 826 (4th Cir.1991) (same); *DesRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir.1991) (deliberate indifference established by showing knowledge of risk of impending harm that is easily preventable, and failure to prevent it); *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir.), *cert. denied*, 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988) (actual or constructive knowledge of risks plus failure to act constitutes deliberate indifference); *cf. Redman*, 942 F.2d at 1443 (prison officials may not act with reckless indifference to a particular vulnerability of which the officials know or should know).[8]

The district court's finding that Superintendent Vail was a credible witness does not undermine the above analysis. As the district court noted, Vail believed that he was in a "lose-lose situation." He believed that if he did not accede to the union's demands and institute the cross-gender clothed body search policy, he would be sued by the employees' union. The wish to avoid a lawsuit from an employees' union, however, does not provide a justification for inflicting pain of a constitutional magnitude upon inmates, even if the belief that a labor grievance suit would be filed was sincere.

Moreover, Vail's attempts to ensure that the searches were conducted in a professional manner do not negate the conclusion that he was deliberately indifferent to the inmates' pain when it became obvious that the pain would be inflicted no matter how professionally the searches were conducted. Psychologists on the WCCW staff warned Vail that the guards' professional demeanor would not ameliorate the risk of psychological harm, and the severe reaction of one inmate occurred during a search that was performed in accordance with the policy.

Implicit in Judge Trott's dissent is the belief that the deliberate indifference standard should not be applied to the adoption of prison policies, because officials who institute policies generally do so after carefully examining the consequences. In the dissent's view, such officials cannot be said to have manifested "deliberate indifference" to the constitutional rights involved, and, thus, prison policies should rarely if ever be found to violate the Eighth Amendment. While at first blush such analysis may have some appeal, a closer examination reveals that it has a fatal infirmity.

The dissent's analysis fails to take into account the full scope of the term "deliberate indifference." It is not enough to say that before enacting a policy prison authorities considered an issue carefully. That is only one part of their obligation. Prison authorities are also required to afford sufficient weight to the constitutional rights of individuals. The failure to treat constitutional provisions with appropriate respect constitutes deliberate indifference to the rights the policy seeks to limit. If a prison administrator decides to ignore grave suffering because of irrelevant or unimportant concerns, that administrator demonstrates a deliberate indifference to the harm being done and to the constitutional principle at stake. For example, if the superintendent of a prison becomes aware that a disruptive prisoner has been threatened with death by other prisoners and he does nothing because he decides that the morale of the prison guards will improve if the disruptive prisoner dies, or that the guards' morale will suffer if he interferes with their wholly inadequate approach to handling the situation, the superintendent will have acted with deliberate indifference to the prison-

---

8. Although *Redman* involves the Fourteenth Amendment's protections, the Eighth Amendment imposes a duty on prison officials at least as rigorous. *Redman*, 942 F.2d at 1442–43.

er's welfare and to his constitutional rights. No matter how much thought and consideration the superintendent gives to the problem, his failure to place a higher value on a prisoner's life than on the staff's morale will constitute "deliberate indifference."

Here, Superintendent Vail urges, in effect, that it is proper to inflict serious psychological pain on the inmates because otherwise it may be necessary to interrupt the lunch periods of female guards, periods during which they are on duty. He also points to other minor concerns relating to the morale and working conditions of the prison staff, and, belatedly, to routine and automatic security concerns. Superintendent Vail considered the harm his policy would cause and instituted the policy nevertheless. He did so because of an exaggerated regard for pragmatic interests of lesser significance and a lack of proper concern for the serious infringement of a counter-vailing constitutional interest. He was advised by his staff of the harm that his policy would cause, yet he elevated a far less important concern above the constitutional injury. It is simply not enough to say, as the dissent does, that he gave the issue a great deal of thought. The "sufficiently culpable state of mind" necessary to find deliberate indifference has more meaning than that. *See Wilson v. Seiter, —— U.S. ——,* 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Under these circumstances, we must conclude that the prison officials' conduct in this matter has been "wanton." The district court properly found that the policy is "unnecessary and wanton."

## C

■■■ The prison officials propose use of another test altogether for establishing a violation of the Eighth Amendment. They argue that the Eighth Amendment challenge, like all of the inmates' other claims, should be measured under the "reasonableness" standard of *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), rather than by the traditional Eighth Amendment approach. We reject this argument.

Although the Supreme Court has stated broadly that "the standard of review we adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights," *Washington v. Harper,* 494 U.S. 210, 224, 110 S.Ct. 1028, 1038, 108 L.Ed.2d 178 (1990), *Turner* has been applied only where the constitutional right is one which is enjoyed by all persons, but the exercise of which may necessarily be limited due to the unique circumstances of imprisonment. *See, e.g., id.* (due process under Fourteenth Amendment); *Turner,* 482 U.S. at 91–99, 107 S.Ct. at 2262–66 (free association under First Amendment); *Michenfelder,* 860 F.2d at 332–36 (applying *Turner* to privacy and Fourth Amendment claims, but not to Eighth Amendment claim); *Griffin v. Coughlin,* 743 F.Supp. 1006, 1010–19 (N.D.N.Y.1990) (applying *Turner* to equal protection claim but not to Eighth Amendment claim); *see also Vigliotto v. Terry,* 873 F.2d 1201, 1203 (9th Cir.1989) (examining Eighth Amendment claim without reference to *Turner* ).[9] Eighth Amendment rights do not conflict with incarceration; rather, they limit the hardships which may be inflicted upon the incarcerated as "punishment." *See Spain v. Procunier,* 600 F.2d 189, 193–94 (9th Cir.1979) (Kennedy, J.) ("Whatever rights one may lose at the prison gates, . . . the full protections of the eighth amendment most certainly remain in force.") (citations omitted). Perhaps for this reason, the Supreme Court has never applied *Turner* to an Eighth Amendment case. We decline to do so today.

## D

The inmates have established a violation of their Eighth Amendment right to be free

---

9. *But see Walker v. Sumner,* 917 F.2d 382, 385–88 (9th Cir.1990) (applying one *Turner* factor to assertion that forced blood test violated Fourth, Eighth, and Fourteenth Amendments, without analyzing constitutional arguments separately);

*Michenfelder,* 860 F.2d at 331 n. 1 (suggesting *Turner*'s applicability to Eighth Amendment analysis, although later using traditional Eighth Amendment approach).

from "cruel and unusual punishments." The record more than adequately supports the district court's finding of psychological harm, and the harm is sufficient to meet the constitutional minima. Furthermore, the infliction of this pain is "unnecessary and wanton" under the applicable legal standards. We uphold the district court's conclusion that the cross-gender clothed body search policy at the women's prison constituted cruel and unusual punishment in violation of the Eighth Amendment.

## IV

Having identified an Eighth Amendment violation, we must next consider the propriety of the district court's remedy. "The district judge ha[s] the power only to correct the constitutional defects that he [or she] [finds]." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir.1982); *see also Toussaint v. McCarthy*, 801 F.2d 1080, 1107–08 (9th Cir.1986) ("An injunction must be narrowly tailored to cure the constitutional violation and must not intrude on the functions of state officials unnecessarily."), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987).

The district court designed its injunction narrowly. The prison officials are enjoined only from conducting "routine or random clothed body searches of female inmates which include touching of and around breasts and genital areas[ ] by male corrections officers" at WCCW. Findings & Conclusions at 14 (¶ 1) (issuing order of injunction). The court specifically noted that its decision "does not extend to cross gender searches under emergency conditions, cross gender searches of men by women, or cross gender searches at female institutions other than [WCCW]." *Id.* at 13 (¶ 33).

The prison officials have not challenged the scope of the injunction. In any event,

we conclude that the injunction was appropriately tailored to prohibit the identified constitutional violation. The district court has not barred the implementation of random or routine suspicionless searches; in fact, these have continued during the three years since the cross-gender clothed body search policy was enjoined. Only non-emergency, suspicionless clothed body searches by male guards are forbidden.

## V

It cannot be gainsaid that incarceration " 'brings about the necessary withdrawal or limitation of many privileges' and rights,' " *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) (quoting *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948)), or that some conditions that are "restrictive and even harsh" can be "part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). In this case we are presented with the prospect of serious psychological suffering, the infliction of which is demonstrably "unnecessary" and, in the constitutional sense of the word, "wanton." The "standards of decency in modern society," *Baumann v. Arizona Dep't of Corrections*, 754 F.2d 841, 846 (9th Cir.1985), do not permit the imposition of such needless harm.

The inmates have established a violation of their Eighth Amendment rights, justifying the district court's issuance of an injunction. Because the Eighth Amendment grounds are sufficient to support the injunction, we do not reach the inmates' other constitutional claims.[10]

AFFIRMED and REMANDED for recalculation of attorneys' fees.

---

10. The prison officials argue that the district court improperly used a multiplier of 2.0 of the lodestar amount in awarding attorneys' fees. The district court enhanced the lodestar amount because (1) the plaintiffs would have faced substantial difficulty in obtaining counsel without an enhancement for the risk of loss; (2) the enhancement was necessary to reflect the difference in the market treatment of contingent fee cases and cases similar to this one; and (3) the plaintiffs' counsel secured important results which benefit society as a whole. The Supreme Court in *City of Burlington v. Dague*, — U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), recently limited the use of contingency enhancements to the lodestar amount. We thus conclude in light of *Dague* that the enhancement here was not proper and the case must be remanded for recalculation of fees in the light of *Dague*.

REINHARDT, Circuit Judge, with whom CANBY, Circuit Judge, joins, concurring:

Eldon Vail is the superintendent of the Washington Corrections Center for Women. The prison employs both male and female guards.[1] Superintendent Vail has authorized the male guards (as well as the females) to search the clothed bodies of the female inmates randomly and routinely, using a "grab-type motion" to "rub," "strok[e], squeez[e]," and "knead[ ]" the women's exteriors, including their covered breasts, buttocks, inner thighs, and crotches. The guards are told to "push inward and upward" when searching the women's upper thighs and crotches and to check the crease in their buttocks with a downward motion of the edge of the hand. There is no dispute that the searches are necessary; the question is whether, under the Constitution, male guards may perform them.

Prison regulations prohibit male guards from conducting strip searches and body cavity searches. However, Superintendent Vail contends that the prison's security will be compromised if male guards are prohibited from conducting the clothed body searches as well. He also contends that the rights of both the male and female guards to equal employment opportunities and to the full benefits of their collective bargaining agreement will be adversely affected if the male guards are not permitted to perform their share of those searches. The female inmates urge that *cross-gender* clothed-body searches are invidious and violate their rights under the first, fourth, and eighth amendments. They contend that clothed body searches may be performed only by female guards. The district judge agreed with each of the inmates' constitutional arguments.

### I.

The majority decides this case on the basis of the eighth amendment. I believe that the conduct challenged here violates the fourth amendment as well as the eighth, and that this case is more properly decided on the basis of the former constitutional protection. The question of which constitutional provision to rely upon when an act violates more than one is, however, a prudential matter. Here, a majority supports the proposition that the eighth amendment has been violated, but a number of its members do not wish to reach the fourth amendment question. While I would prefer to rely on the fourth amendment and believe strongly that the court should do so, I agree fully with Judge O'Scannlain's reasoning and conclusion that these searches violate the eighth amendment. Accordingly, I join his opinion, with the exception of Part II.[2] In the discussion that follows, I analyze this case under the fourth amendment. I set out my reasons for relying on that amendment in Part V, *infra*.

### II.

· Washington Corrections Center for Women, a state prison for women, in Gig Harbor, Washington, opened in 1971. Prior to July, 1989, male guards at the prison did not actually conduct searches of the female inmates. While under the regulations male guards were permitted to conduct "suspicion searches"—to search an inmate's clothed body if they had reason to suspect that the woman was carrying contraband or if there were an emergency—suspicion searches were, in practice, always conducted by female guards. The prison regulations also permitted "suspicionless searches," but the regulations expressly stated that those searches were to be conducted by female guards only. Until July, 1989, only one type of suspicionless search was authorized, "routine searches." Routine searches were performed (by female guards) at fixed checkpoints, such as the kitchen or the visiting room. In July, 1989,

---

1. As the institution's name suggests, there are no male inmates at the prison, only females.

2. *Judge O'Scannlain's opinion is thus a majority opinion insofar as it relates to the existence of an eighth amendment violation as well as with respect to all matters other than the choice of* that amendment rather than the fourth amendment as the proper basis for our holding. Part II of his opinion, dealing with the decision to rely on the eighth amendment rather than the fourth, represents a plurality view only.

Eldon Vail, the new superintendent of the prison, authorized guards to begin conducting a second type of suspicionless search called "random searches." Under the policy establishing random searches, no cause is required for the search and no fixed locations are provided for. The policy calls for guards to search a minimum of ten inmates per shift at random during the day and swing shifts; searches may be conducted anywhere in the general prison area or in any part of the women's cells themselves; unlike routine searches, there is no advance notice that a random search will be conducted.

When Superintendent Vail issued the policy providing for random searches, he authorized male as well as female guards to conduct them, and he also, for the first time, authorized male guards to conduct routine searches. After the superintendent's actions, as of July 5, prison policy authorized all guards to conduct both "suspicionless" and "suspicion" searches. However, as the majority points out, this policy lasted only one day, following which, first by agreement and then by injunction, the authority of male guards to conduct suspicionless searches was suspended. Although no injunction was sought with respect to suspicion searches, the prior practice of having those searches conducted by female guards only continued in effect.[3]

Superintendent Vail was prompted to issue his new policy by a grievance from the guards' union that challenged the prison's assignment of routine (suspicionless) searches to female guards alone.[4] In the past, prison administrators had denied similar grievances because they believed that the single-sex searches were "consistent with ... prudent correctional management." Superintendent Vail testified that

when he made his decision to allow cross-gender searches, he was in a "lose/lose" situation. If he turned down the grievance, the guards would sue; if he authorized male guards to conduct the searches, the inmates would sue.[5]

Prison administrators call the cross-gender clothed body searches "pat searches." The district court refused to adopt the prison's term, wisely in my view. According to the prison's training materials, the proper way to conduct such a search is to

> Squeeze and knead the shoulders....Knead ... the inside of the waistband of trousers [and] pull[ ] the fly away from the body. From behind, ... [use] both hands across the crotch[,] [p]ushing the hands across the crotch[,] ... [s]queezing and kneading all seams.... The breast area shall be searched in a sweeping motion, using only the back of the hand.... The breasts of a female will be flattened by this method. Use a flat hand and a pushing motion across the crotch area. Maintain a flat, inward pushing motion. The edge of the hand in a downward motion can be used to check the crease in the buttocks. Push inward and upward when searching the crotch and upper thighs of the inmate.

Washington Corrections Center for Women, *Pat–Down Searches of Female Inmates*. While some modifications to the procedure may have occurred, the descriptions by the prison personnel and inmates, the training material, and a videotape viewed by this court reveal that the searches involve nothing so delicate or so tentative as "patting." Rather, the searches are intimate and deeply invasive.

---

**3.** While suspicion searches are not challenged in this action, I suspect that the outcome would be the same—even though the controlling issue might be slightly different; *i.e.*, whether it would be feasible for male guards who develop sufficient suspicion regarding particular inmates either to summon female guards to conduct the searches on the spot or to take the inmates to a post at which a female guard is stationed so that the search may be conducted there.

**4.** At the time the grievance was filed, Superintendent Vail had not yet authorized the second category of suspicionless searches—random searches.

**5.** In an unsuccessful attempt to minimize inmates' complaints, Superintendent Vail ordered that all random and routine searches, whether performed by male or by female guards, be conducted in the presence of a staff member who was to act as an observer.

Male guards conducted the intrusive suspicionless searches on July 5, 1989. After an inmate was searched by a male guard, her fingers had to be pried from the bars she had grabbed; she returned to her cellblock, vomited, and broke down. As soon as the searches began, the inmates filed a *pro se* complaint in district court. The prison informally agreed to suspend them that same day. Two days later, when the superintendent decided to reinstitute the searches, the inmates obtained a temporary restraining order. They subsequently obtained a preliminary injunction and were certified as a class. After a six-day trial, the district court entered a permanent injunction barring cross-gender suspicionless clothed body searches.[6] The state appealed.

### III.

I believe that invasive cross-gender searches violate the fourth amendment rights of female prisoners. Persons who have been convicted of crimes do not forfeit all of their rights under the Constitution when they pass through the gates of a prison. No "iron curtain" separates prison inmates from constitutional protections, *Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974); rather, inmates retain "those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." *Hudson v. Palmer*, 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984) (plurality opinion). Prisoners may not be subjected to invidious racial discrimination, *Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (per curiam); they may petition the government for a redress of grievances, *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); they may not be denied access to the courts, *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); they are entitled to due process of law, *Wolff v. McDonnell, supra;* and they may not be subjected to cruel and unusual punishment, *Hudson v. McMillian,* — U.S. ——, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

Of more particular concern here, prison inmates have a right of privacy and dignity in their persons.[7] Although the Supreme Court has held that prisoners have no right to privacy in their cells, *Hudson v. Palmer, supra* (plurality opinion), the limitation on privacy rights has not been extended to searches of prisoners' bodies. *See id.*, 468 U.S. at 555 n. 31, 104 S.Ct. at 3215 n. 31 (Stevens, J., concurring in part and dissenting in part). Following *Hudson v. Palmer*, courts, including ours, have consistently held that the fourth amendment applies to searches of prisoners themselves. *See, e.g., Cornwell v. Dahlberg*, 963 F.2d 912, 916–17 (6th Cir.1992) (male inmate strip-searched before female guards raises a valid fourth amendment privacy claim); *Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir.1988) (visual body cavity searches of inmates do not violate fourth amendment); *Bonitz v. Fair*, 804 F.2d 164 (1st Cir.1986) (fourth amendment right to be free of body cavity search overcomes claim of qualified immunity). The parties do not dispute that the fourth amendment is implicated in this case.

In *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Supreme Court established the general stan-

---

6. Thus, as of now, male guards do not conduct any body searches of female inmates. *See supra* page 1532, ¶ 2; page 1533, ¶ 1.

7. Judge O'Scannlain states that I fail "to pinpoint precisely which legitimate Fourth Amendment interest is violated by these searches." Majority at 1524. He is sorely mistaken. The precise fourth amendment interest that is violated is "[t]he right of the people to be secure in their persons ... against unreasonable searches." U.S. Const. amend. IV. Moreover, while privacy is the primary interest underlying the fourth amendment, *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), that amendment also protects persons against infringements of bodily integrity, *Winston v. Lee,* 470 U.S. 753, 761, 105 S.Ct. 1611, 1617, 84 L.Ed.2d 662 (1985), and personal dignity, *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966). The Court refers to these interests together as "dignitary interests." *Winston v. Lee,* 470 U.S. at 761, 105 S.Ct. at 1617. It is the privacy and dignitary interests of the female inmates that are violated here.

dard for evaluating prisoners' constitutional claims, including fourth amendment claims.[8] *Turner* distills the principles originally established in *Bell v. Wolfish,* 441 U.S. 520, 551, 99 S.Ct. 1861, 1880, 60 L.Ed.2d 447 (1979), and a series of related cases.[9] *Turner* summarizes the standard that emerged from these cases as follows: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is 'reasonably related' to legitimate penological interests [and is not] an 'exaggerated response' to those concerns." *Turner,* 482 U.S. at 87, 107 S.Ct. at 2260–61; 96 L.Ed.2d 64 (1987). *Turner* also identifies four factors that should be considered when determining whether this standard is met: first, whether there is "a 'valid, rational connection' between the prison regulation and a neutral, legitimate government interest put forward to justify it"; second, whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; third, whether and to what extent accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and, fourth, whether a ready alternative to the challenged practice exists that will fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. *Id.,* 482 U.S. at 89–91, 107 S.Ct. at 2262.

The four factors must be evaluated in light of the Court's overarching task: to determine whether a prison's policy is reasonably related to prison administrators' valid concerns or is an exaggerated response to those concerns. Under *Turner,* a prison's response to its penological concerns must be *appropriate:* it must be *reasonable;* it cannot stand if it constitutes an overreaction.

The *Turner* factors must be applied in light of the type of constitutional violation involved and the circumstances of the particular case. Some weigh more heavily in some circumstances; others more heavily in others.[10] We derive guidance as to how the *Turner* factors are to be applied in "unreasonable search" cases from *Bell v. Wolfish, supra. Bell* tells us that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish,* 441 U.S. at 559, 99 S.Ct. at 1884. Instead, *Bell* mandates a balancing test. It states, "In each case [the test of reasonableness] requires a balancing of the need of the *particular* search against *the invasion of personal rights that the search entails." Id.* (emphasis added). Thus, after applying the four *Turner* factors and evaluating all the circumstances, we must ask whether the prison's need to use male guards to conduct the body searches—to the extent that such need exists—outweighs the constitutional injury resulting from the invasiveness of the intrusion.

In evaluating a claim under *Turner,* a court must accord "appropriate deference to prison officials," *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987), because "the judiciary is ill-equipped to deal with the difficult and delicate problems of prison management," *Thornburgh v. Abbott,* 490 U.S. 401, 407–08, 109 S.Ct. 1874, 1878, 104 L.Ed.2d 459 (1989). This admonition applies especially strongly to concerns over prison security, which, the Court has stated, is the most important of all legitimate

---

**8.** Although *Turner* discusses prison policies that implicate inmates' first and fourteenth amendment rights, the *Turner* standard has been applied to prisoners' fourth amendment rights as well. *See, e.g., Covino v. Patrissi,* 967 F.2d 73 (2d Cir.1992); *Cornwell v. Dahlberg, supra; Michenfelder v. Sumner, supra.* The Supreme Court has held that *Turner* applies whenever "the needs of prison administration implicate constitutional rights." *Washington v. Harper,* 494 U.S. 210, 224, 110 S.Ct. 1028, 1038, 108 L.Ed.2d 178 (1990). However, the Court has not applied *Turner* to eighth amendment cases. *See Hudson v. McMillian, supra; Wilson v. Seit-*

er, — U.S. —, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

**9.** In addition to *Bell,* the Court cites as the source of its rule *Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984); *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

**10.** *See infra* note 11.

correctional goals. *Hudson v. Palmer,* 468 U.S. at 525, 104 S.Ct. at 3199. While courts must refrain from substituting their judgment for that of prison administrators, *Whitley v. Albers,* 475 U.S. 312, 322, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986), deference "does not mean abdication," *Walker v. Sumner,* 917 F.2d 382, 385 (9th Cir.1990). "[*Turner's*] reasonableness standard is not toothless," *Thornburgh v. Abbott,* 490 U.S. at 414, 109 S.Ct. at 1882. "[W]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Turner,* 482 U.S. at 84, 107 S.Ct. at 2259 (internal quotation omitted; citation omitted).

## IV.

### A.

If the *cross-gender* clothed body searches authorized by Superintendent Vail are to pass constitutional muster under *Turner,* there must, first, be a "valid, rational connection between [the *cross-gender* searches] and the legitimate governmental interest put forward to justify [them]." *Turner,* 482 U.S. at 89, 107 S.Ct. at 2262 (internal quotation omitted; citation omitted). Prison administrators claim that the security needs of the prison and the employment rights of the guards justify *cross-gender* searches. As I discuss below, the connection between any legitimate penological interest and *cross-gender* searches is tenuous.

*Turner* next requires a court to determine whether alternative means of exercising the constitutional right remain open to the inmates. *Id.,* 482 U.S. at 90, 107 S.Ct. at 2262.[11] The prison's authorization of suspicionless cross-gender searches leaves the inmates no means of protecting their bodies against unreasonable searches. An inmate can do nothing to escape a search. Even an inmate who stays in her cell and behaves impeccably can be forced to submit to a male guard's search of her body in an offensive, invasive, and intimate way.

The third factor to be addressed under the *Turner* analysis is "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." *Thornburgh v. Abbott,* 490 U.S. at 418, 109 S.Ct. at 1884. "When accommodation of an asserted right will have a *significant* 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262 (citation omitted; emphasis added). Here, there will, of course, be no adverse effect of any kind on other inmates if female guards instead of male guards conduct the body searches, and, as I explain below, there is no evidence that there will be more than a slight impact on the rights of prison staff. The general grousing by the staff reflected in the record is no substitute for facts.

Finally, under *Turner,* courts must consider whether there is an alternative to the challenged practice that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests. The existence of an "obvious, easy" alternative suggests that the regulation is not reasonable but is an exaggerated response to prison concerns. *Id.,* 482 U.S. at 90–91, 107 S.Ct. at 2262. Here, there is, without question, an obvious, easy alternative to the use of male guards to perform searches which *because of their cross-gender nature* are highly offensive and intimidating to the female inmates whose bodies are searched: female guards can be used instead. Doing so may require a slight ad-

---

**11.** One does not usually speak of "exercising" one's right to be free from unreasonable searches in the same way that one speaks of exercising one's right to marry, *Turner,* 482 U.S. at 94–99, 107 S.Ct. at 2265–67, or one's right to receive mail, *id.,* 482 U.S. at 91–93, 107 S.Ct. at 2263–64. The "passiv[ity]" of the right involved, *Harris v. Thigpen,* 941 F.2d 1495, 1517 (11th Cir.1991), has caused this court to observe that the second *Turner* factor is "much more meaningful in the first amendment context than in the fourth." *Michenfelder v. Sumner,* 860 F.2d at 331 n. 1. However, while the second *Turner* factor may ordinarily be of less importance to a fourth amendment inquiry, it is not entirely without significance, and the weight we give it will depend on the circumstances of the case at issue.

justment to guards' work schedules, but that is a small price to pay for the preservation of the inmates' fundamental constitutional rights. Almost any accommodation of constitutional rights will result in some "administrative burden"; most accommodations are not "cost-free." *Salaam v. Lockhart*, 905 F.2d 1168, 1173 (8th Cir.1990), *cert. denied*, 498 U.S. 1026, 111 S.Ct. 677, 112 L.Ed.2d 669 (1991). The minor adjustments in the practices of the Washington Corrections Center for Women that the use of female guards would require are relatively insignificant, both in themselves and when weighed against the constitutional interests at stake.

### B.

Properly applied, the four *Turner* factors address the question whether a particular prison policy is reasonable or constitutes an overreaction. To answer that question fully, it is necessary to evaluate carefully both the interests advanced to justify the prison policy and the practical effect of the policy on the inmates' rights. It is also necessary to examine the force of the connection between the specific provisions of the policy and the underlying problems they are designed to alleviate. Only by assessing these factors is it possible to determine whether the prison's actions are *reasonably* related to the interests it advances—to decide whether the connection between the policy and the prison's interests is reasonable or whether, in light of the effect of the policy upon the prisoners' constitutional rights, it reflects an overreaction. It is not enough that there are security concerns that may be alleviated to some minor degree by the regulation, or that the warden is acting in good faith and on the basis of his or her experience with the type of problem at hand. While legitimate concerns may justify *a* restriction, it is the *particular* restriction that must be justified by the particular problem at hand. For example, in *Turner*, the Court found that there were legitimate security concerns that justified placing *reasonable* restrictions upon the right to marry. However, it ultimately concluded that the *particular* regulation represented an exaggerated

response to those security objectives. *Turner*, 482 U.S. at 97–98, 107 S.Ct. at 2266. Here, there are legitimate concerns that justify suspicionless searches; the question is whether the specific solution of having *male* guards perform the searches is reasonable. In answering this question, we give all due deference to the knowledge and experience of prison administrators. *Id.*, 482 U.S. at 85, 107 S.Ct. at 2259. Having done so, I conclude that the cross-gender searches and the prison policy authorizing them are clearly "unreasonable."

### (1)

The first interest that prison administrators advance in support of the policy authorizing clothed body searches by male guards is that of institutional security. The officials contend that suspicionless searches serve to suppress the movement of contraband through the prison and that if male guards do not conduct some of the searches, inmates will be able to predict, based on the gender of the guards around them, whether searches will be conducted.

As the majority opinion notes, the district court found that the prison's security concerns do not justify random and routine *cross-gender* searches. In fact, the record reveals only a slight penological justification for having the searches conducted by male guards. With all due respect to the Superintendent, the "predictability" concern on which he primarily relies appears to be highly conjectural.

Superintendent Vail's written explanation of his reasons for instituting the cross-gender searches are significant. They do not *mention* "predictability" or the prison's security needs; they discuss instead "the efficient operation of the institution and ... the adverse impact [of the prohibition of random searches by male guards] on staff and inmate morale. Of equal importance is the fair distribution of employee work duties." At trial, the superintendent testified, "The beginning of this issue, as I understand it, was that there was a lot of female officers who were simply tired of doing all the searches and the males didn't

do them. They didn't see that that was fair or equitable." When Superintendent Vail was asked at his deposition, "Specifically, what security issues again are you responding to in having male officers perform pat searches?" he testified, "I am not responding to a security issue by having *male* officers perform the pat searches. I'm responding to security issues by moving towards that *a pat search is conducted* at random locations around the facility. In order to do that and not be in a position where I am open to charges of sexual discrimination, it requires that all officers be allowed to conduct pat searches" (emphasis added). At trial, the Superintendent acknowledged giving the above answer during his deposition. He then added that he thought the statements in his deposition were consistent with his trial testimony.

Further, there are no facts in the record that contradict or undermine the district court's finding. To the limited extent that Superintendent Vail's testimony may be said to be contrary to the district court's conclusions, the testimony is entirely speculative. Superintendent Vail hypothesized, for example, that the advantage of unpredictability would be lost if men were not permitted to conduct random searches: "[I]f an inmate knows that there's three male officers on that side of the institution, then that's the time to move the contraband." This testimony was significantly undermined on cross-examination when the superintendent admitted that inmates would not ordinarily know the sex of the guards "on that side of the institution" until they arrived there, and therefore could not know in advance that "that's the time to move the contraband." In addition, an inmate cannot possibly know in advance whether a temporary search location will be set up so that guards may conduct random searches "on that side of the institution." Even more important, neither Superintendent Vail nor any other prison administrator suggested that single-gender

deployment of male prison guards is required by prison security interests or is supported by any other legitimate penological consideration—or even that it would be in any way desirable from an efficiency or other institutional standpoint. Superintendent Vail's speculation is similar to the type of general assertion regarding security concerns advanced by prison officials in *Turner* and rejected by the Court. *Id.*, 482 U.S. at 97–99, 107 S.Ct. at 2265–66.[12]

Moreover, the Superintendent's reliance on the "predictability" factor proved unfounded. As the record reflects, the prison's experience while the district court's preliminary injunction was in effect was that prison security was not impaired in the slightest by the prohibition against cross-gender searches. Superintendent Vail testified at trial that following the issuance of the injunction the prison authorities were able to conduct all the searches he believed necessary using only female guards—and that the searches were conducted at the times and places and in the manner he believed desirable.

In short, the prison's policy of authorizing male guards to conduct suspicionless searches of the female prisoners is not supportable on the basis of the stated security considerations. Female guards can and do perform those searches just as effectively, and without in any way jeopardizing any of the prison's security interests. I do not minimize the need of every prison to maintain the security and safety of guards, staff, and inmates. However, "the Supreme Court has repeatedly held that routine and automatic arguments to the effect that 'every step taken to protect constitutional rights of prisoners will lead to a breakdown in institutional discipline and security' are inadequate to support restrictive prison regulations or policies." *Walker v. Sumner*, 917 F.2d at 387 n. 3. (citations omitted). That admonition is particularly appropriate here.

---

12. In *Turner,* the Court found that although some marriage restrictions might be justified by security interests, the prison's particular anti-marriage prohibitions were not warranted—that they were not reasonably related to a legitimate penological interest. The Court reached this conclusion notwithstanding the Superintendent's testimony regarding his security concerns and notwithstanding his experience regarding prison security matters. *Id.*

The second interest that the prison administrators advance is that barring male guards from conducting suspicionless searches would require some adjustments of staff schedules and job responsibilities, and the overriding of the bid system in the collective bargaining agreement, possibly leading to litigation by the guards' union. Minor adjustments of staff schedules and job responsibilities do not constitute the type of administrative burden that justifies overriding constitutional rights; nor does the need to modify a provision of a labor contract. The adjustments pointed to by the prison officials are *de minimis* indeed. Moreover, as the majority correctly concludes, the guards' employment rights have not been compromised by the injunction against cross-gender searches. Experience has demonstrated that the bid system and the collective bargaining agreement are not adversely affected. Even prior to the issuance of the injunction, prison policy provided that female guards alone could conduct random urinalyses, strip searches, body cavity searches, and searches of female visitors, and that male guards alone could conduct searches of male visitors. The preliminary injunction against cross-gender searches at the prison did not cause the prison authorities to seek a single BFOQ or to change the job of a single guard as of the time of trial; all that has been required, according to the record, is some adjustments in scheduling and job assignments, adjustments that are no more burdensome than those required from time to time for a variety of other non-penological reasons. Superintendent Vail acknowledged reluctantly that the changes had

been made without causing any significant disruptions, and did not suggest any reason that the changes could not remain in effect. The burden on the prison—enlisting the cooperation of the guards' union, adjusting job responsibilities, calling female officers away from their on-duty meals to perform searches—is minor, and a minor burden must be endured in order to preserve constitutional rights. *See Salaam v. Lockhart*, 905 F.2d at 1171 (holding required changes in prison policy not burdensome in light of the overall cost of operating the prison).[13]

### (2)

While the prison's penological interest supporting the regulation is minor, the impact of cross-gender searches on the inmates' constitutional rights is substantial. The district court found that an unknown number of the women inmates would be greatly harmed if the searches were reinstituted. The district court's finding is clearly correct.

Most of the inmates at the prison have been physically and sexually abused by male family members or strangers.[14] Having male guards rub, squeeze, and knead their bodies is exceedingly harmful to these women. A former clinical psychologist at the prison testified that the intrusive searches could lead to revictimization, anxiety, depression, and possibly increased suicide attempts in women who are survivors of male violence. A psychiatric social worker who worked at the prison testified that the intimate searches presented "al-

13. The guards' union stated in its brief that the suspension of the cross-gender policy has forced female guards to incur greater risk because they have more contact with inmates. The record fails to disclose a single injury suffered by a guard as a result of searching an inmate. The union also states that the suspension of the policy has reduced employment opportunities at the prison for male guards, "as entry-level officers must perform such searches." This speculation is unsupported by the record, which explicitly states that not a single BFOQ has been established because of the injunction. The guards further contend that the injunction discourages women from becoming correctional officers. The record is void of any information that might support such vague speculation. Fi-

nally, the guards claim that the suspension of the cross-gender searches "results in a greater risk of contraband being hidden." This claim was refuted at trial by Superintendent Vail, who, as noted above, testified that the injunction had not prevented prison guards from conducting as many searches as he thought necessary, in locations and at times that he thought necessary, and in a manner of which he approved.

14. According to a study conducted by a former clinical psychologist at the prison, eighty-five percent of the inmates have been victims of men's sexual or other physical violence.

most an unendurable psychological threat and stress" for such inmates. Another clinical psychologist testified that women with histories of personal victimization would likely be revictimized by male guards' invasive contact with their breasts and genitals, because the guards' touching was unsolicited and the women were powerless to prevent it.

Furthermore, even the inmates who did not experience the degradation that these inmates recounted would suffer substantial harm if subjected to cross-gender searches. The intrusive, probing searches at issue here permit men in positions of ultimate authority to flatten the breasts of women who are powerless and totally subject to their control, to knead the seams of their clothing at their inner thighs, and to thrust their hands inward and upward into their crotches. Such conduct is offensive in the extreme to *all* women, regardless of their prior sexual history.

A common-sense understanding of the different experiences of men and women in this society, *Ellison v. Brady,* 924 F.2d 872, 879 (9th Cir.1991), leads to the inescapable conclusion that invasive searches of the bodies of female prisoners by male prison guards are harmful both because they constitute and reinforce gender subordination, and because they offend our basic values and our concepts of human dignity.

### C.

Under the Constitution, searches of prisoners' bodies, like other limitations on prisoners' constitutional rights, must be reasonable, and cannot constitute an exaggerated response to a prison's legitimate goals.

In evaluating the interests that Superintendent Vail has advanced in support of the prison's policy, we "accord wide-ranging deference" to the superintendent's judgment that particular "policies and practices ... are needed to preserve internal order and discipline and to maintain institutional

security." *Hudson v. McMillian,* —— U.S. at ——, 112 S.Ct. at 999 (citations omitted). No matter how deferentially judged, however, the interests that the superintendent has advanced are insubstantial. They are significantly outweighed by the harm the policy inflicts on the inmates and the injury it does to their constitutional rights. Thus, they fail the *Bell v. Wolfish* test as applied in light of the four *Turner* factors.[15] If we say that *any* legitimate penological interest, no matter how minor, requires us to find that a prison's policy is valid, then we cannot find any policy invalid, because a prison will rarely if ever adopt a policy that lacks even a colorable claim of validity. Rather, a prison policy must be invalidated if, after giving due deference to the knowledge and experience of prison administrators, we find that the constitutional infringement outweighs the prison's legitimate penological interests. Such is certainly the case here. It is simply not reasonable to have the searches at issue conducted by male guards.

Because the suspicionless cross-gender searches are not " 'reasonably related' to legitimate penological objectives [and] represent[ ] an 'exaggerated response' to those concerns," *Turner,* 482 U.S. at 87, 107 S.Ct. at 2261, they violate the fourth amendment. I would uphold the district court's injunction on the basis of that constitutional violation.

### V.

I now address Part II of Judge O'Scannlain's opinion and explain why I believe that it is more appropriate to base our decision on the fourth amendment than on the eighth. In my view, the Supreme Court's recent decision in *Soldal v. Cook County* dictates that approach. *Soldal v. Cook County,* —— U.S. ——, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). In *Soldal,* the Court considered conduct that could be analyzed under both the fourth amendment and the due process clause. Unanimously

---

**15.** As noted above, that test is as follows: "The test of reasonableness under the Fourth Amendment ... requires a balancing of the need of the *particular* search against *the invasion of person-* *al rights that the search entails."* Bell v. Wolfish, 441 U.S. at 559, 99 S.Ct. at 1884 (emphasis added). *See supra* page 1524.

reversing a Seventh Circuit decision that looked only to the "dominant character of the conduct challenged," *id.* —— U.S. at ——, 113 S.Ct. at 548 (quoting *Soldal v. Cook County,* 942 F.2d 1073, 1080 (7th Cir.1991) (en banc)), the Court stated that where a wrong "implicate[s] more than one of the Constitution's commands ... we examine each constitutional provision in turn." *Id.* There can be no doubt that the question whether the particular type of search involved here is constitutional implicates the fourth amendment. Judge O'Scannlain's opinion acknowledges that fact. Majority at 1524. Moreover, no court has held that searches of prisoners' bodies should be assessed under a different constitutional provision. *See supra* Part III. However, because the searches at issue here implicate the eighth amendment as well, the question therefore arises as to which amendment, the fourth or the eighth, should constitute the basis for our decision.[16]

I believe that *Soldal* requires us to consider the fourth amendment *before* we consider the eighth. The *Soldal* Court emphasized the importance of applying "the more 'explicit textual source of constitutional protection' [rather than] the 'more generalized notion.'" *Id.* —— U.S. at ——, 113 S.Ct. at 548 (quoting *Graham v. Connor,* 490 U.S. at 394–96, 109 S.Ct. at 1871).[17] The conduct at issue in this case "plainly is a 'search.'" Majority at 1524. The "explicit textual source of constitutional protection" with respect to "searches" of "persons" is, without doubt, the fourth amend-ment, not the more general eighth amendment.

The majority argues that the most appropriate basis for examining the challenged searches in this case is the cruel and unusual punishments clause of the eighth amendment, because the searches inflict pain. However, *Soldal* requires us to look to the fundamental conduct at issue before proceeding, if necessary, to more generalized characterizations of the challenged behavior. Here, the fundamental conduct at issue is a search. The searches of the female inmates, not the pain those searches inflict, is the conduct challenged by the plaintiffs. Similarly, the cross-gender searches, not the infliction of pain, are what the district court's injunction prohibits. Pain is simply an incident of the unreasonable searches, not, as Judge O'Scannlain would have it, "[t]he gravamen of the inmates' charge."[18] Majority at 1524–25.

The term "search," as it is used in fourth amendment jurisprudence, has a specific core meaning.[19] Insofar as searches of persons are concerned, the term applies to all such examinations of the individual— pat-down searches, clothed body searches, visual strip searches, visual body cavity searches, and digital body cavity searches—no matter how minimal or how probing they may be. In contrast, the term "cruel and unusual punishment" has no fixed, core meaning. It is a far more general term that is not limited to one type of behavior, but applies instead to a variety

---

16. The fourth amendment involves an objective test of reasonableness while the eighth amendment requires a subjective inquiry into the state of mind of the prison officials. *Graham v. Connor,* 490 U.S. 386, 396–400, 109 S.Ct. 1865, 1872–73, 104 L.Ed.2d 443 (1989). It is the subjective inquiry that poses the most difficult problems for both the majority and the dissent. The objective inquiry undertaken here is a far simpler one.

17. Under *Soldal,* if the challenged conduct, analyzed in light of the "explicit textual source of constitutional protection," leads to the conclusion that a constitutional violation has occurred, the court need go no further. If, however, the court's analysis under the more explicit constitutional provision leads to the conclusion that no violation has occurred, the court must then proceed to examine the conduct in light of the remaining constitutional provision or provisions implicated.

18. Although the searches inflict pain, they are not unreasonable simply because of the pain they cause. *See supra* Part IV.B.(2). The existence of pain is a factor in determining whether the searches are unreasonable, but does not dictate that determination.

19. I address the term "search" rather than the term "unreasonable search" because that is the mode of analysis the Court used in *Soldal* when it addressed "seizure" rather than "unreasonable seizure." *Soldal,* —— U.S. at ——–——, 113 S.Ct. at 543–48.

of forms of unconstitutional governmental conduct. Under the cruel and unusual punishments clause, courts have analyzed, for example, claims that sentences are unduly harsh or otherwise constitutionally inappropriate,[20] claims that inmates have been subjected to physical abuse[21] or unlawfully denied medical treatment,[22] and claims that conditions of confinement "deny 'the minimal civilized measure of life's necessities.'"[23] *Wilson v. Seiter,* —— U.S. at ——, 111 S.Ct. at 2324 (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

The cruel and unusual punishments clause functions in this case in the same way that the due process clause did in *Soldal:* it is the generalized, not the explicit, notion of constitutional protection implicated by the challenged behavior.[24] Similarly, the prohibition of unreasonable searches in this case functions in the same way that the bar against unreasonable seizures did in *Soldal:* the fourth amendment is the explicit textual source of constitutional protection against the search, as it was against the seizure. A fixed core meaning inheres in the constitutional prohibition of both unreasonable searches and unreasonable seizures; each describes a discrete form of conduct. Because, in my view, the fourth amendment is without question "the more explicit textual source of constitutional protection" against the searches at issue here, I believe that this case should be decided on that basis.

Even without *Soldal,* logic tells us to consider the fourth amendment first. There is an advantage to simplicity, even in the law. Under the fourth amendment, the legal issue is clear, and the problem is relatively simple. All parties agree that the challenged actions constitute a search; the only question is whether the search is "unreasonable."[25] The determination of reasonableness merely requires the application of objective legal principles. Accordingly, we should not commence with the complex issues posed by an exploration of eighth amendment doctrine.[26] Moreover, while no search of prisoners' bodies could violate the eighth amendment without also violating the fourth, the converse is not true. Thus, in cases involving such searches, an examination of the fourth amendment issue will always be dispositive, while an eighth amendment analysis

---

**20.** *See, e.g., Harmelin v. Michigan,* —— U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (sentence of life imprisonment without the possibility of parole imposed on a drug offender without prior felony convictions); *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (death penalty applied to mentally disabled man).

**21.** *See, e.g., Hudson v. McMillian, supra* (prisoner beaten without penological justification); *Whitley v. Albers, supra* (inmate shot in the knee during a prison riot).

**22.** *See, e.g., Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

**23.** *See, e.g., Wilson v. Seiter, supra* (mentally and physically ill prisoners housed with healthy prisoners; prison overcrowded and excessively noisy, with inadequate heat, excessive heat, improper ventilation, unclean and inadequate bathrooms, and unsanitary dining facilities and food preparation).

**24.** For examples demonstrating the range of governmental conduct implicated by the due process clause, *see Planned Parenthood v. Casey,* —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (state abortion statute); *Morgan v. Illinois,* —— U.S. ——, 112 S.Ct. 2222, 119 L.Ed.2d

492 (1992) (attributes of jury in capital sentencing); *Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (right of family members to terminate artificial hydration and nutrition of woman in persistent vegetative state); *Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (parental rights of putative biological father); *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (state sodomy statute); *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (propriety of pumping suspect's stomach to retrieve capsules of narcotics).

**25.** We have once before considered the constitutionality of a prison's policy of cross-gender searches. In *Grummett v. Rushen,* 779 F.2d 491 (9th Cir.1985), we found "routine pat-down searches, which include the groin area," conducted by female guards on male inmates, to be constitutional. *Id.* at 495, 496. Holding the cross-gender searches at issue here unconstitutional is not inconsistent with *Grummett;* the type of injury caused by the current searches is quite different from that which we considered there. *See supra* Part IV.B.(2).

**26.** *See supra* note 16.

may prove to be only a precursor to the necessarily duplicative fourth amendment review.[27]

For the above reasons, I believe we should base our holding on the fourth rather than the eighth amendment.

### CONCLUSION

In my view, the prison's cross-gender clothed body searches violate the fourth amendment. I would uphold the injunction on that ground. However, I also believe the searches violate the eighth amendment. I therefore join in Judge O'Scannlain's opinion, except for Part II.

NOONAN, Circuit Judge, concurring:

I concur in Judge O'Scannlain's opinion and add: The prison warden has not ordered his male guards to conduct cavity searches of his women prisoners. Why? It is surely no less deprivation of an employment opportunity for the men. It is surely no less an extra duty for the female officers. It would surely improve security for such searches to be conducted by both sexes. As Judge Trott has observed, prisoners are adept at concealment in their private parts. But common sense, or rather, common decency has told the warden that no one could stomach such gross sexual contacts between male guards and women prisoners. Naked genitalia of one gender cannot be routinely inspected by guards of the other gender. Indecency of this kind is beyond our expectation as a society and beyond what the Constitution countenances.

The plain fact is that the searches at issue here are not essentially different. They are searches of women's genitalia, breasts and buttocks by men—inspections not conducted by consent with a therapeutic purpose, but police operations carried out on persons powerless to object and not only commanded to cooperate by unbuttoning their blouses, removing their belts, taking off their shoes, and raising their legs, but searched and shoved and squeezed in those areas of their bodies that have the closest connection with their sex. That the women are partially clothed does not alter the areas that are explored. That the prison officials should call these probings "pat downs"—a preposterous misdescription as Judge O'Scannlain's opinion makes clear— underlines the indifference to decency with which the prison warden has proceeded.

Is indecent treatment cruel and unusual in the sense of the Constitution? Standards of decency derive from normal conduct. The indecent is a breach of the norm, is the unusual. The indecent is not necessarily cruel, but when indecency is inflicted by men on powerless women it has the sexual character that manifests the sadistic. It is cruel.

Under the criminal code of the state of Washington sexual contact with the genitalia, breasts or buttocks of another person is a Class B felony. *Matter of Welfare of Adams*, 24 Wash.App. 517, 601 P.2d 995 (1979); 9A Wash.Rev.Code Ann. § 44.100. Even though "the community standards of decency, propriety and morality have degenerated markedly" since 1939, *Adams*, 601 P.2d at 997 n. 2, the sexual touching of such areas of another person's body constitutes the crime of "indecent liberties." *Id.*

Under Washington law it makes no difference that the touching is done through the clothing. *Adams*, 601 P.2d at 997. In reaching this result the Washington court cited similar conclusions reached by an Oregon appellate court, *State v. Buller*, 31 Or.App. 889, 571 P.2d 1263 (1977); by the Utah Supreme Court, *State v. Peterson*, 560 P.2d 1387 (Utah 1977), upholding a conviction of "forcible sexual abuse" where the defendant had touched the vaginal area of the victim through her slip, the court defining the forbidden touching in dictionary terms as including "to examine by

---

**27.** A search does not violate the fourth amendment if it is reasonable. A search of prisoners' bodies that inflicts pain *yet is reasonable* cannot, by definition, constitute cruel and unusual punishment, because only conduct that *wantonly* inflicts *unnecessary* pain constitutes such punishment. *Wilson v. Seiter*, —— U.S. at ——, 111 S.Ct. at 2324. Pain cannot be deemed wantonly and unnecessarily inflicted if the search that inflicted it is judged to be necessary—or reasonable.

feeling with the fingers"; and *People v. Thomas,* 91 Misc.2d 724, 398 N.Y.S.2d 821 (N.Y.Crim.Ct.1977), where District Attorney Robert Morgenthau successfully prosecuted for the misdemeanor of "sexual contact," N.Y.Penal Law § 130.01(3), a male IRT rush-hour rider who squeezed a female passenger's clothed buttocks.

Under prior Washington law, such contacts would not have been criminal unless done "for the purpose of gratifying sexual desire." *State v. Wilson,* 56 Wash.App. 63, 782 P.2d 224, 227 (1989). The statute, as amended in 1988, has eliminated this language. 9A Wash.Rev.Code Ann. § 44.100 (West Supp.1992). It is an open question whether that purpose could still be read into the statute's continuing requirement of "sexual contact." We do know that under *Adams* the touching is criminal whether the woman touched is naked or clothed. The crime is complete "when the other person is incapable of consent by reason of being mentally defective, mentally incapacitated, or physically helpless," 9A Wash.Rev.Code Ann., § 44.100(b). It is fair to say that prisoners are physically helpless. We do know that the criminal law that protects the unimprisoned part of the state's population is not suspended in the state's prisons.

But our task is not to determine if the guards' contacts would be criminal—helpful though the criminal law is in reflecting community standards of decency—but to determine if this cruel and unusual conduct is unconstitutional punishment. The warden focussed on the needs of his prison's administration. Does that fact save him?

The Framers were familiar from their wartime experience of British prisons with the kind of cruel punishment administered by a warden with the mentality of a Captain Bligh. *See* Robert Troup Affidavit (Jan. 17, 1777), in *A Salute To Courage,* at 66 (Dennis P. Ryan, ed. 1979). But they were also familiar with the cruelty that came from bureaucratic indifference to the conditions of confinement. *See* Letter from Robert Morris, George Clymer and George Walton to George Washington (Jan. 7, 1777), in *1 Correspondence of the Amer-*

*ican Revolution,* at 324–326 (Jared Sparks, ed. 1853); Letter from Benjamin Lincoln to George Washington (Sept. 25, 1780), *3 Correspondence of the American Revolution* at 96–98; Troup Affidavit, *supra,* at 67. The Framers understood that cruel and unusual punishment can be administered by the failure of those in charge to give heed to the impact of their actions on those within their care.

A bland American civil servant can be as much of a beast as a ferocious concentration camp guard if he does not think about what his actions are doing. Single-minded Inspector Javert is a monster, even though he focused only on his duty. Half the cruelties of human history have been inflicted by conscientious servants of the state. The mildest of bureaucrats can be a brute if he does not raise his eyes from his task and consider the human beings on whom he is having an impact. Here the blind spot in the warden's mind—his inability or unwillingness to take into account the indecencies he was commanding his male guards to commit—constituted indifference, indifference to the suffering he was going to inflict on the helpless persons placed within his responsibility. Such indifference was wanton and it was obdurately maintained even when a flood of light was cast on the subject. It was unconstitutional punishment.

How did a civilized country and a civilized state like Washington get into this fix where it takes federal judges to tell a responsible state official to stop his approval of indecency because he is violating the Constitution? By blindly going down an egalitarian path premised on the belief that there are no real differences between the sexes, that we must march to a unisex world. In the necessary effort to eliminate discrimination based on gender there has been a simpleminded effort to eliminate gender. But we are en-gendered persons.

There should not be male guards at a women's prison. There should not be a male superintendent of a women's prison. Our statutes should not be construed to require such mechanical suppression of the recognition that in our culture such a rela-

tion between men in power and women in prison leads to difficulties, temptations, abuse, and finally to cruel and unusual punishment. That is the broader context of this case.

We, however, are not asked to reform the prison system of Washington, and the constitution does not assign us such a role. Our task is narrower and wholly within our constitutional competence. It has been confided to the federal courts to say when those imprisoned by the state are being subjected by the state to indecent acts, cruel and unusual and punitive. It is the genius of our Constitution to impose on one part of government the duty to protect from excess those under the power of another part of government. At the very bottom of the social scale, in a prison, we must halt a mindless process that disregarding our moral culture and our human nature also oversteps the boundaries set by our fundamental law.

TROTT, Circuit Judge, with whom WIGGINS and KLEINFELD, Circuit Judges, join, and with whom WALLACE, Chief Judge, joins in part, dissenting:

I begin with some information about prisons. This information is helpful to a complete understanding of this case.

Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for anti-social criminal, and often violent, conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others. Even a partial survey of the statistics on violent crime in our Nation's prisons illustrates the magnitude of the problem.... 

Within this volatile "community," prison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but also visitors. They are

under an obligation to take reasonable measures to guarantee the safety of the inmates themselves. *They must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today;* they must prevent, so far as possible, the flow of illicit weapons into the prison; *they must be vigilant to detect escape plots, in which drugs or weapons may be involved, before the schemes materialize.* In addition to these monumental tasks, it is incumbent upon these officials at the same time to maintain as sanitary an environment for the inmates as feasible, given the difficulties of the circumstances.

*Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984) (emphasis added).

## I

The Supreme Court tells us that "[t]o be cruel and unusual *punishment,* conduct that does not purport to be punishment at all must involve *more* than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (emphasis added). The "more" that it must involve is a state of mind on the part of the antagonist that is "wanton." *Id.* at 320, 106 S.Ct. at 1084. "The source of [this] intent requirement is not the predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual *punishment.*" *Wilson v. Seiter,* —— U.S. ——, ——, 111 S.Ct. 2321, 2325, 115 L.Ed.2d 271 (1991) (emphasis in original).

*Whitley's* subjective requirement was reiterated in *Wilson* with considerable emphasis:

It is *obduracy and wantonness, not inadvertence or error in good faith,* that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs,

or restoring official control over a tumultuous cellblock.

*Id.* — U.S. at ——, 111 S.Ct. at 2324 (quoting *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084) (emphasis in original).

In repeating this holding, the Court in *Wilson* flatly rejected the idea that intent is irrelevant to the inquiry. *Id.* — U.S. at —— n. 1, 111 S.Ct. at 2324 n. 1. Justice White made this crystal clear in the second paragraph of his dissent where he complained that the majority disregarded prior decisions holding that "conditions [of confinement] are themselves *part of the punishment,* even though not specifically 'meted out' by a statute or judge." *Id.* — U.S. at ——, 111 S.Ct. at 2328 (emphasis in original).

As to "the objective component of [Jordan's] Eighth Amendment prison claim (was the deprivation sufficiently serious?)," *Wilson,* — U.S. at ——, 111 S.Ct. at 2324, I accept Judge O'Scannlain's conclusion that it has been satisfied. I believe, however, that the inmates' "shocking" testimony, which he has summarized quite well, has seeped into his analysis of the subjective element. *Wilson* makes it clear one should not inappropriately carry over into the other: "We do not agree with respondents' suggestion that the 'wantonness' of conduct depends upon its effect upon the prisoner. *Whitley* teaches that, assuming the conduct is harmful enough to satisfy the objective component of an Eighth Amendment claim, whether it can be characterized as 'wanton' depends upon the constraints facing the *official.*" *Wilson,* — U.S. at ——, 111 S.Ct. at 2326 (citation omitted) (emphasis in original).

To summarize, all controlling Supreme Court Cruel and Unusual Punishment Clause cases "mandate inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment. *See also Graham v. Connor,* 490 U.S. 386, 398, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)." *Wilson,* — U.S. at ——, 111 S.Ct. at 2324. Unless an actionable state of mind can be identified, the claim must fail.

The problem is there are *two* definitions of wantonness in this Constitutional con-

text, and one of our tasks is to determine which standard controls. Is it "deliberate indifference" as defined in *Wilson* and *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), or is it "maliciously and sadistically for the very purpose of causing harm" as explicated in *Whitley* and *Hudson v. McMillian,* — U.S. ——, ——, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992)?

For the answer to this question, we need turn first to the record to examine what it is we are dealing with: a security expedient, a medical need of the prisoner, or a measure of both? Justice Holmes issued a wise admonition that is useful to keep in mind as we perform this exercise. He said, "We must think things not words, or at least we must constantly translate our words into the facts for which they stand, if we are to keep to the real and the true." Oliver W. Holmes, *Collected Legal Papers* 238 (1920). The facts of this case are these: Some women in prison with histories of sexual and physical abuse by men will have their external private parts periodically searched through their clothing by the hands of male corrections officers. This touching may cause them considerable distress, a distress which those of us who have not experienced it may not fully appreciate. Nevertheless, these women are in prison because they committed serious *felony* offenses, thus forfeiting their liberty. Prisons are difficult places, but we must deal with the way things are, not the way we would like them to be.

As we examine our subject's Constitutional morphology, we kill two birds with one look, for as we take its measurements, we also explore the mental state of the warden responsible for the practice to see whether that mental state was "culpable" or not. The practice under scrutiny here turns out to be inseparable from the intent with which it was both conceived and implemented.

## II

### A.

Are we dealing with a practice instituted in the Washington Corrections Center for

Women ("WCCW") that "purports to be punishment"? My answer is no. The record is devoid of *any* evidence whatsoever even suggesting that the disputed searches were designed to be or implemented as punishment. Whatever one thinks of the propriety or efficacy of these searches, they were intended only to control the unacceptable movement of contraband throughout the facility.

The idea of implementing cross-gender searches for contraband at WCCW originated with Mrs. Tana D. Wood, the Assistant Director of the Division of Prisons of the Washington State Department of Corrections. During her lengthy career, she had been a classification counselor, a correctional unit supervisor, a correctional program manager, the Associate Superintendent of the Washington State Penitentiary, and a division director. Mrs. Wood was the Acting Superintendent of the WCCW between October 1, 1988, and January 20, 1989, when she turned the job over to Superintendent Vail. Mrs. Wood served at WCCW while recruitment and hiring of a permanent superintendent was being conducted after the reassignment of the previous warden.

One of Mrs. Wood's first tasks on arrival at WCCW was to conduct an overview of security; she called it her "primary interest." She concluded "security was quite lax." She testified: "I was quite surprised to find out, for example, that pat searches were done very infrequently and only in one or two well-specified places;" and "I discovered that we were not doing cross-gender pat searches. I was very surprised they weren't doing it." When asked to explain her surprise, she answered "I would presume any correctional officer would pat search ... because of my experience in the male institutions [where female correctional officers patted down male inmates] and partly because I consider a correctional officer to be a professional person, and I don't think gender has anything to do with a correctional officer's performance of duties."

Mrs. Wood discussed her security findings and concerns with Larry Kincheloe, the Director of the Division of Prisons, telling him among other things that she was surprised to discover not all officials were conducting pat searches at WCCW, only the females. Mr. Kincheloe testified he was surprised because in the women's prisons he had visited, there "was always a cross-gender search."

When Eldon Vail was chosen to take over WCCW, Mrs. Wood transmitted her concerns to him.

A.... I alerted him to the fact that [the absence of cross-gender searches] was an issue, how how [sic] I felt that it related to security in terms of not doing random searches and not doing enough searches, and that that was something that he was going to have to deal with right away.

Mrs. Wood, however, did not make the disputed decision. She left it to her successor.

Q. Before you left WCCW as its interim superintendent, had you made a decision in your own mind regarding cross-gender pat searching at WCCW?

A. I had made what was probably a personal decision. I made a conscious decision, in fact, that I would not deal with that, being the interim superintendent. It was more appropriate for the new superintendent to make a policy decision. My observation was that I felt that it was something that was long overdue and should be implemented, but I did nothing formally to cause that to happen.

Mrs. Wood did, however, ask her administrative assistant to take a brief survey for Superintendent Vail's use of cross-gender search practices at other penal corrective facilities.

Thus, the actual decision-maker was Superintendent Vail, who the district court found to be a credible witness. To unveil Superintendent Vail's purpose and his motivation, I quote him directly:

Q. Were there any specific security goals and objectives you wanted to achieve through this cross-gender pat searching?

A. From my experience, the ability for a correctional officer to conduct a pat search is a fundamental part of his or her job, and in most institutions or in other facilities that I had been in, what I had witnessed was that taking place. Inmates knew it and staff knew it, that searches of the clothed body can occur any place, any time when an officer decides that it needs to occur. That creates the unpredictable element in inmate movement throughout the institution so that inmates always have to be on guard a bit about packing contraband. That there's always at least a slim chance that someone will ask to search them. And overall, that was—that was and is the security issue that we've tried to implement.

Later, Superintendent Vail observed "that you've got to have an element of unpredictability in a correctional facility to impede and deter the flow of contraband within it." Director Kincheloe, with whom Superintendent Vail consulted about his decisions, agreed: "I felt that the control of contraband was necessary ... and that without the cross-gender searches that could not be accomplished." The reason for his belief? The need for unpredictability.

### B.

What kind of a problem was Superintendent Vail addressing? Was his a relatively trouble-free institution housing mostly passive offenders, or over the years had it become something else? What does he mean by "contraband?" Superintendent Vail gives us the answers:

A. I believe from '85 to '88 our records show that we doubled the amount of contraband discoveries within the institution. Inside of that larger category of contraband are [sic] weapons recoveries also doubled. Drug and drug paraphernalia recovery has approximately tripled during that time. From 1985 to 1988 we doubled the amount of drug offenders in the institution. The number of violent offenders, I think, went up seven percent. Today at the institution, one out of

five individuals are incarcerated there for killing another human being. We have 31 percent drug offenders.

"Contraband" includes everything from egg salad sandwiches and guitar strings to deadly weapons, alcohol, drugs, heroin, cocaine, and hypodermic needles. Mrs. Wood testified that contraband food is a problem because it is used to make "pruno," or prison alcohol. The ingenuity of prisoners in this regard is beyond debate. Superintendent Vail also noted that he has "HIV", or the potential for AIDS, in the institution, and that he was very worried about the "three or four" syringes found in 1989 that could be shared by the prisoners for whom he had responsibility.

The record also reflects an increasing level of violence by inmates against Superintendent Vail's staff *and* other prisoners: two instances in 1982, five in 1983, fifteen in 1984, eight in 1985, twelve in 1986, eighteen in 1987, fourteen in 1988, and twenty-one as of November, 1989.

Mrs. Wood also provides information as to the nature of WCCW, information that may be of interest to those who are interested in women's behavior in prison as compared to men's.

Q. During your three- or four-month period as the interim superintendent at WCCW, did you make—did you have the opportunity to make any observations of female inmates regarding topics such as violence, contraband?

A. I spent actually quite a bit of time observing, talking to, and also comparing the female offender with the—my experience in the male facilities. I was—actually it was of interest to me and I was—I don't know if I was surprised or not, but I found that there was not that much difference in most issues. The types of crimes that they were committed for, the types of issues that were important to them were very, very similar to the males. I made some—I don't know if they were relevant, you know—observations about what I thought about in terms of property and the money they had at their disposal. I found that they intimidate each other, they pressure each

other. Weapons of choice may be slightly different than a man just because of physical strength. But I spent a lot of time, I was very interested in determining similarities or dissimilarities between the two populations.

### C.

Was Superintendent Vail cognizant of the potential of these searches to cause negative side effects such as psychological distress and gender harassment? The answer is yes.

A. I've never pretended that this is anything but a very complex issue, and I think there are merits on both sides of this case. I think that the concerns expressed by the inmates are very real regarding the discomfort and potential for harm and at least fear at having this occur. I want to build some checks and balances into the system so that they feel that there's some protection from the administrative level on how these searches and when these searches get conducted.

There's other features in the policy that speak to that, too. The idea of having a sergeant decide whether or not a search is to occur is something I would never put in a policy at a male facility. I wouldn't need to. That comes from their initial training and it's an expectation of all officers and it's conducted regularly with all officers. It represents such a radical change at WCCW, though, that I wanted the sergeants' involvement to eliminate any appearance of harassment.

Moreover, Superintendent Vail consulted his mental health staff regarding the search procedure, changed some of its aspects to reflect their input, and produced a lengthy training video tape for all staff. The tape was designed to ensure that the staff knows how to conduct the searches with professionalism and to interfere as little as possible with the inmates' dignity.

The title of the training tape is "Philosophical Aspects of Cross–Gender Pat Searches." It features Superintendent Vail and psychiatric social worker Lindy Simons discussing (1) the psychological

characteristics of the women in WCCW, (2) the prior abuse factor and its implications on behavior, (3) how such women relate in prison to male supervisors, (4) the possible effects of pat searches on inmates, and (5) how correctional officials should cope with the inmates' reactions to cross-gender searches. The tape also contains a section entitled "Improper Pat Search Procedure" in which a male officer demonstrates on a female officer the wrong way to conduct a search. This is followed by a section called "Proper Pat Search Procedure." It is noteworthy that this lengthy training tape is *not* designed to teach officials how to find contraband, but how to conduct the search with sensitivity to the concerns of the inmates. The tone of the tape can be summed up by a "voice over" statement during the demonstration sections that says, "Remember, maintain a professional demeanor at all times."

### D.

How did Superintendent Vail implement his decision to use cross-gender searches to promote security in his prison? Again, I quote from his testimony.

Q. How quickly—well, how quickly did you start thinking about training regarding cross-gender pat searching after you made your decision on February 26th, 1989, to implement such a policy?

A. Immediately training became an issue in my mind.

Q. What were your initial thoughts regarding training on the policy?

A. That it was going to be very important to the success or failure of the implementation of that policy.

Q. Did you delegate any responsibility regarding training?

A. Different portions of it, yeah.

Q. How did you do this?

A. That was through the task force committee—whatever you want to call that group of folks—that we put together to sit down and talk and work each of the different issues.

Primarily, training and coming up with the technique of the cross-gender search,

or a female pat search, actually, was charged to Wanda McRae. I think there's a couple of other people involved as well. It might have been Willy Daigle and Walt Waitkevoch, but I'm not sure of that. I asked them too—mainly asked Wanda to go and find out what resources exist describing the different ways to do this type of search and to look at those resources, to combine, subtract, add, do whatever she felt was appropriate to come up with the best search for the facility.

Q. Did you monitor the progress of this training committee?

A. Sure. We met regularly.

Q. What is regularly? How often did you meet?

A. At least once every couple of weeks, even if the meeting was only ten or fifteen minutes, to find out what tasks had been completed or what obstacles folks had run up against....

Q. Were there any specific training outlines, documents, studies, ever prepared in connection with this training mission?

A. Well, there was a training outline that was a final result of the work that Wanda did. It was refined on a couple of occasions. I had some input into it. Actually I had a lot of input into it and changed some lines in it that I didn't like.

Q. Now, Lindy Simons. We see you talking with her on the videotape. I think it's Plaintiffs' Exhibit 15, if I'm not mistaken. Was Lindy Simons involved at all on the training committee, directly or indirectly?

A. On the training committee?

Q. Yes.

A. No. On the implementation committee, but not training committee.

Q. All right. Let's talk for a few moments about the implementation committee, what its distinct mission was apart from the training committee?

A. I brought together folks from different areas of the institution to sit and talk this issue through. Different individuals or pairings or trios from that group were given specific assignments to go off and do and bring back to the larger group. Lindy was part of the larger group.

Q. What was the mission of this implementation committee?

A. To take us from start to finish on this issue. The decision had been made that we were going to pursue this search, and I needed all the help I could get from the institution staff about how to get that done.

Q. Now, was it at this time that Lindy Simons started to discuss her concerns regarding the cross-gender policy at WCCW?

A. Probably before the time that that group was put together.

Q. And again, this would have been after your February 26th, 1989 decision?

A. She may have spoken to me briefly before then, but I'm not sure.

Q. You say that you did have some input into how the search was finally trained?

A. Yes.

Q. Did any of this input come through the conduit of this implementation committee?

A. Yes.

Q. What was some of that kind of input?

A. Well, I believe at one of the meetings we reviewed the training outline—when I say training outline, I'm talking about the actual technique that Wanda had put together with her group—and we did some editing of it, made some changes to it.

Superintendent Vail revised the search his policy called for as he acquired more information about its potential for causing distress to some inmates. Originally, the search was to be conducted by an officer positioned behind an inmate using the palm of the hand. Superintendent Vail altered this as he attempted to minimize the search's invasiveness. He explained:

A. A search, any search of a room, of going through a metal detector, or whatever, is an invasive procedure, and my own feeling was that to do it from behind

was too invasive of a procedure. It made me too uncomfortable.

Q. What did you suggest and what was finally implemented as an accommodation to this feeling?

A. That we would do that portion of the search from the front and that we would do it with the back of the hand.

Q. And again, what portion of the search were you talking about at this point, where you are in front of the inmate?

A. The groin.

Q. And how is that done from in front of the inmate?

A. You put your—the training that I went through, which hopefully was similar to what everybody else went through—you put your hands around the lower to upper thigh of the inmate and then you go·up, twisting and turning until you get to the crotch area, and your hand is—this blade of your hand (indicating) is into the crotch at that point and you simply turn sideways and you go back down the leg all the way.

Q. You turn sideways so that the back of your hand—

A. Is in the crotch area.

Q. What is the length of the contact of the back of your hand with the crotch area?

A. Very brief. A second.

Q. Is there any movement with the back of the hand against the crotch area? Is there a sliding movement?

A. No. No. The intent is to see if it feels like there is something in there that shouldn't be or any sounds such as cellophane are made.

Q. So it's just a momentary pat literally of the crotch area?

A. Yes.

.    .    .    .    .

A. ... The original examples when we were figuring this thing out of how the search could be conducted was almost exclusively from behind the inmate. It was exclusively from behind the inmate. I was uncomfortable with that for a number of reasons, some of them relating to

the input from mental health staff. What I did do was direct that the search move more towards the front—in other words, the position of the officer in relationship to the inmate. I think yesterday I said to the front, and that was probably misleading—so that the breast area and the legs and crotch area are generally searched from the side.

The court itself explored the particulars of the disputed search. Once again, Superintendent Vail displayed an appreciation of the competing sides of the issue.

By Judge Bryan:

Q. Mr. Vail, it seems to me, I guess—well, maybe that's not the right way to put it. I—I asked questions where I seem to take a position, and I don't mean to take a position. I'm asking them to find out what you think. I guess what it seems to me is that, generally, the palm and fingertips are more sensitive than the back of one's hand or the side of one's hand?

A. Yes.

Q. If security is the issue, wouldn't it be a far better search to use the palms and fingers than the back and sides of hands in these sensitive areas that are areas that contraband can easily be transported?

A. *It would be a better search, but I guess part of the balancing act of—of the needs of the staff and the inmates is to try and reach away (sic) to do this as painlessly as possible.*

Q. I think you already addressed this, but I guess—trap you into the idea that there is some pain involved for the inmates?

A. I recognize that.

(emphasis added).

Moreover, Superintendent Vail instituted a transitional "two officers present" policy. He explained this feature as follows:

Q. Was there requirement for an observer under the old searching policy?

A. No. No, there was not.

Q. Did you make a change regarding that aspect?

A. Yes.

Q. What was the change, and why would you make it?

A. Well, we required two officers to be present during the search, one to actually conduct it and one to observe, and that was for a number of reasons. One, probably the main one, was that both staff and inmates were going to be very uncomfortable doing this search, and the possibility of accusations of staff misconduct existed and continue to exist.

Fears on the part of the offender were also of concern, and it was hoped that the presence of a second individual would simply have a calming influence on the whole process. And also provide another source of information should allegations occur, either from the inmate as to improper search—there were two possibilities. One, the inmate says there's an improper search and it didn't occur. The other is that there was an improper search and it did occur. That gave me another person to ask about what happened on that day.

Superintendent Vail also established a grievance procedure for inmate complaints which included a channel directly to him. In addition, he displayed an interest in the selection process of the correctional officers who would be responsible for carrying out this procedure.

A. . . . Also in progress right now, I've got my personnel manager, my training manager, and one of the psychiatric social workers working on a list of questions to ask perspective candidates to hopefully weed out those people who are racist or have negative attitudes towards women.

### E.

Superintendent Vail's implementation of cross-gender pat searches at WCCW cannot correctly be evaluated in isolation. It was part of an overall readjustment of security search practices within the Corrections Center. By using random cross-gender pat searches, Superintendent Vail was able substantially to reduce other search procedures, one of which is very invasive and dehumanizing: the strip search. Superintendent Vail explains:

Q. Now, did I understand your earlier testimony correctly when I thought you said that you cut down on the incidents of mandatory pat searching?

A. Yes, you did understand that correctly.

Q. What specific areas did you remove from the requirement for mandatory pat searches?

A. Going through the maintenance gate and coming to visiting.

Q. Are no inmates pat searched who are going to visiting?

A. Sometimes they are.

Q. You have random pat searching?

A. Yes.

Q. Did you make any other changes to search practice at WCCW?

A. We eliminated 50 percent of the strip searches for medium security inmates after contact visiting. In other words, we went from 100 percent to 50 percent.

Q. Why?

A. Well, if the point is to deter, then the most important element is to be unpredictable. And also, you know, despite the fact that I think it is important to do pat searches and I think it is also important to do strip searches, it is an invasive procedure and it is difficult for some women to go through that experience. I felt like we could maintain a similar, same, or may be even better level of security by a different approach to those two searches.

Q. And again, I want you to be specific on the different approach.

A. Well, it was so—you know, it was predictable. If you go to visiting and you're a medium security inmate, you are going to be strip-searched. You know that. Well, that tells an inmate what they need to do or not do to get contraband inside the institution. It's just like the pat searches being mandatory at certain locations. What was more important was to introduce the element of unpredictability into the operation. And if we could do that by avoiding half of

the strip searches, it was better, in my estimation.

### F.

The obvious question persists as to why Superintendent Vail did not assign the pat search task only to female correctional officers? His answer is illuminating as to not only the problems a superintendent faces in managing a prison but also certain legal complexities created by laudable measures our society has adopted to insure equal employment opportunities for both sexes.

Superintendent Vail was operating under a system-wide affirmative action program in the Department of Corrections that had a specific goal of 43 female officers for his institution. As of the date of his testimony, he had 45 male and 41 female correctional officers, and 3 male and 4 female correctional sergeants. He testified that parity for female officers was one of his concerns.

Second, when Superintendent Vail took over his job—in the shadow of an escape and with a mandate to tighten security—female correctional officers were conducting all routine pat searches; and he discovered that the correctional officers' union had filed a grievance against this practice because it required women to do more work than men. The union was threatening action unless this inequality in workload was eliminated.

In an honorable attempt to extricate himself from these cross currents, Superintendent Vail explored a possible solution: the BFOQ. 42 U.S.C. § 2000e–2 (1988).

Q. (By Mr. Betsacon) Mr. Vail, are you familiar with the acronym BFOQ?

A. Yes, I am.

Q. What is that?

A. Bona fide occupational qualifications.

Q. And what is the purpose of a bona fide occupation qualification?

A. In that way you can designate certain positions in an institution for particular sexes. It could be for males, it could be for females.

Q. Did you consider BFOQ as an alternative to cross-gender pat searching in your facility?

A. I talked about it with a number of folks, Mr. Kincheloe being one. He indicated to me that based on his experience, we wouldn't get them. And also personnel staff, Robert Turk and Donna Grazzini. Their opinion was the same as Mr. Kincheloe's, that we would be unsuccessful in an attempt to get BFOQ's for the institution.

Q. Thank you.

Mr. Vail, if you had an all-female staff, would that help you out at all on the pat searching at WCCW and the concerns that have been registered by inmates regarding cross-gender searching?

A. Yes, it would.

Q. Is that an alternative that you considered in this case at all?

A. No, it's not one that I would believe in, nor is it one that I think is legal from my training.

Mr. Kincheloe testified that they *did* have BFOQs in the Division of Prisons, but only for unclothed searches. It was his opinion based on dealing with the state Human Rights Commission that BFOQs for clothed searches would not be approved.

When this solution proved unpromising, the Superintendent implemented his disputed policy, giving the following explanation as to why cross-gender searching, as opposed to searches conducted only by female officers, was necessary:

Q. Now, Mr. Vail, you have indicated to the court your feelings when you first took over as the superintendent of the facility regarding security matters in general and your idea of the security goals that you set out for the facility. You have explained some of your specific concerns regarding assaults, contraband seizures, and increase in those activities. If we were to presume that this was the right direction to take, random pat searching as opposed to all the mandatory stations that existed prior to your becoming a superintendent and everything else you have done regarding

changing the searching at the facility, why do you need to have cross-gender searching to implement this new security plan?

A. Well, I think it's similar to what I said yesterday, that if an inmate or inmates can predict who can search, where they can search, and when they can search, it becomes easier for them to move contraband throughout the institution. On numerous occasions, I have only men, for example, in a living unit on a particular shift, two males at the same time. If you want to move some contraband in that direction, you know now is the time.

At another point in his testimony, he was more specific:

Q. Why did you need to implement cross-gender pat searching in order to achieve this security goal that you have outlined for the court?

A. Well, from a security point of view—and there's other reasons as well—but from a security point of view, if an inmate knows that there's three male officers on that side of the institution, then that's the time to move the contraband. If there's no expectation, no reasonable expectation that they might be stopped for a pat search, then it gives them a green light to go and move.

On redirect examination, Superintendent Vail remained firm:

Q. Mr. Vail, if the court does not allow you to implement the cross-gender pat searching policy, will that impact your security goal, and if so, how?

A. Going back to 22 hours ago, one of the first things that I said, still—or I will say again, that correctional officers in a prison facility, all correctional officers, need to have the ability to pat search inmates, so that the element of unpredictability about when that might occur is there.

Q. How will not being able to have the cross-gender searching impact on your random search policy?

A. Then I would continue with random searches, depending upon where it heads with individual employees and un-

ion by having female officers do them. What that does is limits our ability to have that element of unpredictability. If you see the female officers there, then you know you might get searched. If some point or some section of the institution is just male officers, you know you won't be.

Q. Does it exclude some portion of your correctional staff from doing these searches?

A. It excludes the males. The beginning of this issue, as I understand it, was that there was a lot of female officers who were simply tired of doing all the searches and the males didn't do them. They didn't see that that was fair or equitable.

Q. If you operate by the guidelines that you are given on affirmative action hiring, how many of your correctional staff may be excluded from performing these random pat searches?

A. Well, if I was precise with those numbers—and I'm not going to be able to do that sitting here—but over half—no, just under half would have to do them and just over half would not have to do them.

Superintendent Vail likened having only female officers conduct the searches to "putting a red flag on half the officers and we assume we ignore gender for a minute. Those with red flags can search; those without can't. It's the same issue. You can see them coming."

It is impossible to deny the utility of unpredictability and the element of surprise when it comes to the efficacy of prison searches. As I discuss more fully in Section VI of this opinion, unpredictability is the backbone of this expedient.

Near the end of Superintendent Vail's testimony, the court inquired as to the feasibility of solving the warden's security problems with BFOQs:

Q. You indicated that you had made—I'm not sure whether you said you made application or only talked to Mr. Kincheloe about making an application for additional BFOQs.

A. As it regards pat searches, we simply talked about it. There was no formal application. They had been made previously at the institution, before I got there. But my best understanding is that they never cleared the Department of Corrections and made it to the Human Rights Commission.

Q. Well, let's suppose that Mr. Kincheloe, or whoever your superiors are in the system, said they thought they could get additional BFOQs, if applied for. Would you want to apply for more? Would it help your operation?

A. There's a couple of hypotheticals there. I'm assuming we're not involved in this court case.

Q. Yeah.

A. To give you the answer—

Q. Forget all this. You've got the security problem and the other problem that you've indicated you recognize, about how the inmates may, feel about this. And would it make your life easier and could you do your job better if you had some more positions?

A. It would make my life a lot easier. We could do a better job of security at the institution, but we'd be left with the hypothetical red flag situation. The other part of it is that in my reading of this document, and that tells me who works in the institution day in and day out, I count in the neighborhood of 22 BFOQs in order to accomplish it, unless I go with a procedure of a designated pat searcher who wanders around the institution all the time and does nothing else. And I don't think that's very realistic or functional.

The pat searches should be a tool that all corrections officers employ. So I would probably have to look at getting a whole lot of them. That's extremely disruptive and a tough way to go. It would throw this schedule out the window. I would have to go through it again. We did that July of this year in terms of putting online a new roster for the staff. And it causes a major disruption in the institution operation.

I'm doing everything but answer your question, I think. There's lots of issues there. You know. It would make it easier. It would improve security. Whether I decided to go that way or not would take a lot of discussion and a lot of talk with folks, because I still think it leaves the window of vulnerability there.

Implicit in my analysis is an acceptance of the gender-balanced workforce of prison officials available at WCCW to perform these searches. There was a time, of course, when women in custodial guard work were rare or nonexistent. Now, men and women share these professional employment opportunities, as it should be. No one is excluded because of gender, again, as it should be. Yet, this court shatters this balance and this overdue accomplishment by effectively forcing *twenty-two* BFOQs on an employer and a gender-integrated union that do not want or require them. We do so not knowing whether there is money in the system to hire twenty-two BFOQs or whether women who may be interested in these difficult jobs are available in that area to fill them. This misguided interference with the valuable employment opportunities of men and women alike is based on the peculiar characteristics of some—but not all—imprisoned murderers, drug traffickers, and other felons, not on the officials' "ability to perform the duties of the job." *International Union, UAW v. Johnson Controls,* — U.S. ——, ——, 111 S.Ct. 1196, 1206, 113 L.Ed.2d 158 (1991). *See generally Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (discussing BFOQs for correctional officials with security-sensitive jobs).

Judge O'Scannlain minimizes the implications of a possible lawsuit by the employees' union aimed at unbalanced work requirements in favor of more employees. When Superintendent Vail was pressed directly as to whether the impetus for his choice was "fear of a union suit," his answer was, "Not out of fear of a union suit, no." But I hardly find Superintendent Vail's attempt to accommodate the work concerns of his female officers and their union to be "wanton." *See Torres v. Wis-*

*consin Dep't of Health & Social Servs.,* 859 F.2d 1523 (7th Cir.1988). What these work concerns illustrate is one of the many "constraints" with which he was faced.

Near the end of Superintendent Vail's testimony, he was asked what he had meant when he referred in his testimony to himself as being in "a lose/lose situation in connection with some part of this policy." He described his position as follows:

A. I think it was Jennifer James who testified that she would support this search if it meant someone was going to die. That's the worst extreme of what might happen some day at that institution, and it might happen because we didn't do everything we could to be as secure as we can.

The other pole of that issue is the very real information provided to me by Lindy Simons, Carol Day, Gretta Woodlock, and in more detail some of what I have heard in the court, that this search does pose some risk to some offenders. The difficult part about it is the knowing who and how and what. It's not like the measles, you can't see it. And it's further complicated, at least if I understand Ms. Simons correctly, by the fact that these folks who may be injured the worst probably won't show it. And those are the—you know, that's the fundamental balancing act, and if I go one way, someone may get hurt, and if I go the other way, someone else may get hurt. I suppose I've come down on the side of physical safety as opposed to emotional safety. If there was a third option, I would love to see it.

Q. Mr. Vail, had you considered this—

THE COURT: The third option is to have me decide what the constitution says, I guess.

THE WITNESS: Well, that's—I didn't want to say that.

### III

### A.

Superintendent Vail's testimony regarding his decision to implement cross-gender pat searches and the manner in which he implemented this practice was unimpeached. This observation is critical in determining whether he had a culpable state of mind as demanded by *Whitley, Wilson,* and *Hudson.* About his testimony, the district court made these observations:

Now, I want to point out an exception to what I just said, and that's Mr. Vail. I found Mr. Vail to be a very credible witness. He is obviously struggling, as I am, with this problem. He is trying his—this is the impression I got—he is trying his best to understand. He is trying to do the right thing for his institution, for his corrections officers, and also for the inmates in it. As he indicated, he's in a lose-lose situation. He can't do anything without making somebody mad. His testimony, in my judgment, reflects that he has given this a great deal of thought, has educated himself about the problem over a long period of time, and basically came across to me as a very credible and very critical and very important witness, and we will talk about that further, too.

The other group of witnesses that I want to mention in regard to credibility are the experts that we had here: Medical, psychological, anthropological—is that a word?—academic. Other than corrections experts. Many of this group of people that testified, particularly those called by the plaintiffs, were clearly strong advocates for women's rights as they saw those rights, and on the other side, *were not experts in the corrections problems that Mr. Vail is faced with.* I think those attitudes may have colored their judgment to some extent.

(Emphasis added).

### B.

There is one fly in this soup. Judge Bryan, the very able district judge, did *conclude,* as pointed out by Judge O'Scannlain, that the "proposed random or routine cross-gender clothed body searches *constitute* the infliction of pain *without penological justification,* and cruel and unusual punishment in violation of the Eighth

Amendment." But with all respect to Judges Bryan and O'Scannlain, the emphasized words resulted from an analysis that is inappropriate in an Eighth Amendment context. Why? Because they represent Judge Bryan's Fourth Amendment *conclusions* based on a *Turner v. Safley* analysis, which Judge O'Scannlain himself says is inapposite when the issue is cruel and unusual punishment. I quote Judge O'Scannlain from his opinion:

> The prison officials propose use of another test altogether for establishing a violation of the Eighth Amendment. They argue that the Eighth Amendment challenge, like all of the inmates' other assertions, should be measured by the 'reasonableness' standard of *Turner v. Safley*, 482 U.S. 78 [107 S.Ct. 2254, 96 L.Ed.2d 64] (1987), rather than by the traditional Eighth Amendment approach. We reject this argument.

Judge O'Scannlain then demonstrates why a *Turner* analysis is inappropriate, and I agree with his analysis. Essentially, the *Turner* analysis is inconsistent with the inquiry called for by *Whitley* and *Wilson*. While Judge O'Scannlain rejects the district court's approach, I respectfully believe he overlooks the effect such an approach had on the district court's conclusions.

None of this is the district judge's fault. He did an excellent job with this complicated and important case, but in 1989 when he rendered his decision, *Wilson* had not yet been handed down by the Supreme Court, and he did not have it to illuminate his path. Instead, he used a method of analysis that does *not* focus on the need to show a culpable state of mind on the part of the actor. He applied a balancing test, measured the searches against alternatives, and *concluded* the searches simply were not necessary. He jumped from this conclusion to a second conclusion that the searches were thus "without penological justification." This is what he meant when he so labelled them, not that Superintendent Vail had failed to show the searches were related to a valid institutional concern.

To demonstrate my conclusions about the meaning of Judge Bryan's statement, I will let Judge Bryan speak for himself:

> I think; the justification for initiating these searches, which is where we turn to *Turner v. Safley* for analysis; and the place in which it is conducted, which of course is in the prison.
>
> So again, if these searches are reasonable, it turns on the question of security interests, that is penological justification for doing it.
>
> Several factors are relevant in determining that issue. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *There is no doubt in my mind that there is a valid, rational connection between this desire to do cross-gender pat searches and the legitimate governmental interest of security in the prison. So the defendants have met that first requirement.*
>
> "A second factor relevant in determining the reasonableness of a prison restriction ... is whether there are alternative means of exercising the right that remain open to prison inmates." Are other avenues available for the security on the one hand and the constitutional rights of the inmates on the other. So we come to the question then of does the security requirements of the women's corrections center overcome this constitutional issue?

(Emphasis added).

Judge Bryan went on to examine the record, and looked at whether, in his judgment, Superintendent Vail had "ample alternatives" to his choice of cross-gender searches. It is here, in my judgment, that the cruel and unusual punishment analysis veered away from the appropriate method of analysis by merging with a Fourth Amendment test.

There can be no doubt about Judge Bryan's analytical approach, and with it in mind, it becomes easy to understand his Conclusion 28. With this understanding, the fly disappears from the soup. Here is the whole picture as seen by Judge Bryan:

25. Applying these considerations to the facts of this case, and deferring to the judgment of prison officials to the extent allowed by the Constitution, the court has concluded that:

(a) there is a rational connection between the proposed searches and prison security interests;

(b) there are no alternative means of exercising the inmates' rights of free exercise of religious freedom from unreasonable search and seizure and right to be free from cruel and unusual punishment if these searches are conducted;

(c) accommodation of the inmates' constitutional rights will have some impact on the allocation of prison resources.

(d) there are ample easy alternatives, most of which impose a *de minimis* cost to valid penological interests. Therefore, the proposed cross-gender pat searches at the Washington Corrections Center for Women are unreasonable.

26. The proposed random or routine cross-gender clothed body searches are unreasonable and therefore violate the Fourth Amendment to the Constitution of the United States.

27. The proposed random or routine cross-gender clothed body searches are an unjustified abridgement of the free exercise of religion of those plaintiffs who have sincere religious objections to such cross-gender contacts.

28. The proposed random or routine cross-gender clothed body searches constitute the infliction of pain without penological justification, and cruel and unusual punishment in violation of the Eighth Amendment.

### IV

Now that we know the relevant characteristics of our subject, we can return to the task of deciding which standard of wantonness applies to our analysis. In my judgment, it is the higher standard: the conduct complained of must have been pursued "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033

(2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). I have four reasons for so concluding.

First, this practice, including its cross-gender features, does have a valid institutional or penological purpose: to stanch the flow of contraband within an institution in which one out of five prisoners has been convicted of killing another human being, in which 31% of the prisoners are there for drug trafficking, and in which the AIDS virus is present. Such a purpose is compelling. As the Supreme Court reiterated in *Bell*, " '[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.' " *Bell v. Wolfish*, 441 U.S. 520, 546–47, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979) (quoting *Pell v. Procunier*, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)). Even though the security practice in this case may clash with a legitimate mental health concern of some prisoners, the fact remains that it is neither gratuitous nor punishment. Moreover, it is the willful and unlawful behavior of the prisoners themselves that is the primary cause of these security searches. The prisoners violate prison rules, they smuggle contraband under their clothes, and they deliberately secrete contraband in and around their private parts. In so doing, they consciously use our cultural sensitivity to touching each other in certain areas as a shield for their misconduct. The prisoners' determination to beat the system is so great that strip searching is necessary to thwart their behavior. It is an unseemly but well-known fact that even their body cavities are used for these purposes. *See generally Bell*, 441 U.S. at 558–560, 99 S.Ct. at 1884–85 (body cavity searches per se in prison do not violate the Fourth Amendment). As we "think things not words," these too are facts of prison life that cannot be ignored.

Second, because cross-gender pat searches would become an ubiquitous institutional practice in the WCCW, rather than isolated events, and because such searches encroach upon an identifiable human need such as food, warmth or exercise, i.e., men-

tal well being, they might be seen as "conditions of confinement." Such conditions ordinarily are measured by the "deliberate indifference" yardstick. *Wilson,* —— U.S. at ——, 111 S.Ct. at 2321. This is true, however, only where the "needs of prisoners [do] not ... clash with other equally important governmental responsibilities...." *Wilson,* —— U.S. at ——, 111 S.Ct. at 2326 (quoting *Whitley,* 475 U.S. at 320, 106 S.Ct at 1084). Because the needs here do clash with governmental responsibilities, and because the judgment as to whether they are "equally important" rests in my view with the State of Washington and Superintendent Vail, the "deliberate indifference" standard is inapposite. Moreover, these searches *are* conducted in the positive interest of inmates' basic medical needs. The searches are designed to eliminate heroin, alcohol, cocaine, hypodermic needles, weapons, and the likes from the prison environment. Their presence in prison constitutes a health and safety menace. Thus, these searches are designed to ameliorate a harmful condition of confinement that is inimical to other basic human and medical needs of inmates, such as freedom from drugs, the AIDS virus, and assaults. This purpose is obvious, and it relates to the state's responsibility to provide a safe environment to people with whom it has a special relationship. A knowing failure to eliminate such dangers from a place of confinement might attach civil responsibility to the officials who failed to act. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being." *DeShaney v. Winnebago Cty. Soc. Servs. Dept.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989); *see Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 1039 ("Prison administrators have ... [a] duty to take rea-

sonable measures for the prisoners' own safety."). What prohibits a state from ignoring such risks to prisoners? The Eighth Amendment, of course, and—as *DeShaney* points out—*Estelle v. Gamble. Id.* 489 U.S. at 200, 109 S.Ct. at 1005. A superintendent is not permitted to be deliberately indifferent to drugs, weapons, and hypodermic needles in prison.

I'm not suggesting for a moment that a superintendent's failure to implement random cross-gender pat searches would constitute deliberate indifference, only that Superintendent Vail's program is legitimate. This duty is yet another "constraint" facing Superintendent Vail.

Third, the higher standard of wantonness has been held applicable even under circumstances where *no* valid institutional concerns are present. I have in mind *Hudson v. McMillian* where no valid or penological purpose whatsoever was found in the unprovoked and gratuitous beating of a prisoner. Yet to demonstrate cruel and unusual punishment, the Court held that the prisoner alleging an excessive force must show more than deliberate indifference to his physical well-being; he must show that the force was applied maliciously and sadistically. Justice Thomas pointed this out in his dissent when he said, "The Court today extends the heightened mental state applied in *Whitley* to *all* excessive force cases, even where no competing institutional concerns are present." *Hudson v. McMillian,* —— U.S. at ——, 112 S.Ct. at 1008. It would be anomalous indeed for the law to impose the highest mental element standard where gratuitous beatings occur but not where valid competing institutional concerns are implicated.[1]

Fourth, the higher standard of wantonness was designed to both honor and implement the long-standing principle that " '[p]rison administrators ... should be accorded wide-ranging deference in the adop-

---

**1.** I take issue with Judge O'Scannlain's assertion in footnote 7 of his opinion that "the absence of an emergency may be probative of whether the force was indeed inflicted maliciously or sadistically." There is a flaw in this logic. The *presence* of an emergency may justify harsh measures to end it, but the absence of an emergency

surely is not probative of a malicious state of mind. All the absence of an emergency does is eliminate one of the possible justifications for harsh measures. This flaw demonstrates how hard one must strain to fit Superintendent Vail's mental state into this category.

tion and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Hudson v. McMillian,* — U.S. at —, 112 S.Ct. at 999 (quoting *Whitley,* 475 U.S. at 321–322, 106 S.Ct. at 1085 (quoting *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979))). The district court sums up well what it is like to be the warden of a state prison in this age:

> The administration there has to fight all kinds of problems in regards to these security interests. They've got to fight political problems, taxes, money availability, the budget process with the state. They have to fight contraband, violence. They've got to fight inadequate staff levels on occasions, lots of occasions. They have to fight overcrowding, a facility that may or may not be what it ought to be. They have to deal with the public concepts of what rights a prisoner ought to lose when they are being punished. They've got to fight, I guess, or consider, the question of the way it's done elsewhere, as we've heard some in this case. Through this, all of this, as Mr. Vail testified, while he's trying to balance these things, he, too, is faced with a conflicting issue involving women's rights.

Judge O'Scannlain claims this case arises from the formulation of a policy "in circumstances where there are no particular constraints on the officials' decisionmaking process...." My good friend and I read this record differently. Thus, I quote it extensively to make my points. In fact, like all others in the United States charged with running anything nowadays, Superintendent Vail is *engulfed* in constraints, cross currents, competing values, labor unions, government regulations, statutes, exposure to lawsuits, personal liability, and in this case, differing views of what constitutes equal protection and opportunity for women in the workplace. Judge Noonan's concurrence matched against Mrs. Wood's testimony demonstrates some of this dissonance. Judge Noonan's view would remove all men from women's prisons and probably relegate Mrs. Wood and her ca-

reer track to second-class status. Mrs. Wood, on the other hand, says, "We are all equal in the workplace." No less a respected publication than the Yale Law Journal published a Note in 1985 arguing that segregating female prisoners from their male counterparts violates the former's Equal Protection Rights. R. Herbert, *Women's Prisons: An Equal Protection Evaluation,* 94 Yale L.J. 1182 (1985). Shall women be combat pilots and fight alongside men in Iraq and Somalia? These are complex policy matters. The issue in this case is most vexing. No one takes any pleasure in approving strip searches or clothed searches or, for that matter, *any* personally invasive procedure. But here, Superintendent Vail did his best to make an informed call, and he ends up labelled obdurate and wanton and likened by one respected member of our court to beasts, brutes, and ferocious concentration camp guards. This result gives Harry Truman's "heat" new meaning and a new level of intensity. When this outcome is matched against the record, and particularly Superintendent Vail's testimony, the comparison suggests either something is wrong with the test, or it has been misapplied. I respectfully believe it is the latter.

In my view, the majority's well-intentioned opinion neglects the mandate that "neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Whitley,* 475 U.S. at 322, 106 S.Ct. at 1085; *see also Grummett v. Rushen,* 779 F.2d 491, 493 (9th Cir.1985). This rule of deference to the judgment of prison administrators in these matters was not fashioned out of a faint-hearted desire to wash one's hands of dirty business. The rule recognizes the hard reality that judges simply do not have the knowledge or the skill to run a corrections facility. We do well not to substitute injudiciously our judgment for the judgment of those who do know how to run prisons, for we are not qualified to make these judgments in the first place. *See Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) ("[C]ourts are ill equipped to deal with the

increasingly urgent problems of prison administration.... Judicial recognition of that fact reflects no more than a healthy sense of realism."). It is "not ... wise for [courts] to second-guess the expert administrators on matters on which they are better informed." *Bell*, 441 U.S. at 531, 99 S.Ct. at 1870 (quoting *Wolfish v. Levi*, 573 F.2d 118, 124 (2d Cir.1978)).

The interference the majority's opinion will cause with the difficult task of managing WCCW, not to mention other prisons, is manifest. We need look no farther than Judge Bryan's discussion of Superintendent Vail's "alternatives" to support this observation. By identifying a latent mental health interest on the part of previously abused prisoners that Constitutionally trumps an institution's legitimate security practice, the opinion unleashes a management nightmare. It takes the characteristics of some and projects them onto the entire class.

But the problem cannot be seen only in terms of this group. Now, any *individual* female *or* male prisoner previously abused sexually is immune from random pat-down searches conducted by a person of the gender of the prisoner's abuser. A male prisoner with a history of abuse as a child by a man—and our prisons are full of them—will surely be able to make a case against random pat-down searches by male correctional officers. A woman previously abused by a woman may be able to do the same. These points are made by the Washington State Corrections Employees Association in their intervenor's brief. What about the victimized prisoner who claims he or she cannot have his or her private parts touched by *anyone* regardless of gender without suffering psychological damage? Judge O'Scannlain's opinion creates the real specter of a special class of untouchable prisoners. Will they wear bright insignias on their clothing so that officers will know they are exempt from this security practice? I submit that anyone who doubts this will happen is unfamiliar with prisons. Mrs. Wood testified that there were no inmate complaints at Walla Walla regarding cross-gender pat searches, but that there were unspecified complaints by male inmates regarding "male-on-male searches." Plus, one cannot help but wonder what impact this decision will have on cross-gender searches of felons arrested on the streets of our communities.

## V

Parts I and II of this lengthy opinion provide the answer to whether Superintendent Vail and his staff acted "maliciously and sadistically for the very purpose of causing harm." They did not. Moreover, I do not believe that even under the lesser standard of deliberate indifference a case of cruel and unusual punishment has been made. We may not favor this controversial practice, just as some may not favor the death penalty, but as to Superintendent Vail it is not only wrong, but highly unfair to conclude his behavior was obdurate and wanton. Even if we believe he has erred in his judgment, it cannot be said his error was not "in good faith." *Wilson*, —— U.S. at ——, 111 S.Ct. at 2324 (quoting *Whitley*, 475 U.S. at 319, 106 S.Ct. at 1084).

Judge O'Scannlain suggests my understanding of "deliberate indifference" is infirm. With all respect to my able colleague, his attempt to expose the flaw may reveal his own error.

Where is the authority to claim, "It is not enough to say before enacting a policy prison authorities considered an issue carefully."? Why isn't it enough? "Indifference," especially as itself a definition of *wanton* conduct, means a state of having "no marked feelings one way or the other." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 623 (1st ed.1984). "Considering an issue carefully" and basing one's judgment on such consideration seems the opposite of "indifference," especially when the "indifference" has to be "deliberate" to be wanton.

Moreover, Judge O'Scannlain's analysis, by claiming (1) that "prison authorities are required to afford sufficient weight to the *constitutional rights* of individuals" (emphasis added), and (2) that "the failure to treat constitutional provisions with appropriate respect constitutes deliberate indif-

ference," loads the question in a way that improperly predetermines the answer. In search of a conclusion that these searches are unconstitutional, he begins with a premise that assures the result, the premise being that these searches violate the prisoners' rights. But what right is he referring to? He declines to confront the prisoner's Fourth Amendment claim because it raises issues that are abstruse. If it is the Eighth Amendment's right against cruel and unusual punishment, Judge O'Scannlain crosses the finish line before the analytical race starts; and it cannot be the infliction of pain per se, because unless the pain is inflicted wantonly or maliciously, it violates no Constitutional prohibition.

"No matter how much thought and consideration the superintendent gives to the problem ...", says Judge O'Scannlain, the superintendent is necessarily wrong and thus deliberately indifferent if Judge O'Scannlain does not agree with his judgment or his conclusion. This is so even though the superintendent's *judgment* arrived at after thoughtful consideration reflects, as it does in this case, a thorough understanding and a thoughtful weighing of the interests and values concerned. A culpable state of mind in this context now includes considered judgment with which we—judges, not prison officials—do not agree. It might have been easier just to say these searches "violate evolving standards of decency," whatever that might mean. In my view, it is an assault on the plain meaning of the words "deliberate indifference" and "wanton" to so characterize Superintendent Vail's testimony, and to do so is incompatible with this record. In essence, the majority opinion imputes a state of mind to Superintendent Vail he does not have: Superintendent Vail's mens rea is constructively found to be wanton and obdurate. When the relevant test depends on the *actual* state of mind of the actor, having to impute it to him is an admission that it does not exist.

Because we have in our hands not only the fate of Superintendent Vail's inmates but also his character and reputation, I repeat what the district court said about his behavior in conceiving of these searches, in implementing them, and in testifying about them in court: He was "very credible," "obviously struggling, as I am, with this problem," "he is trying his best to understand," "trying to do the right thing for his institution, for his corrections officers, and *also for the inmates*," "has educated himself about the problem," and "came across to me as a very credible ... witness." (emphasis added). We do a disservice to this conscientious professional to say he acted with deliberate indifference and wantonness or in bad faith.

VI

I have a number of problems with my esteemed colleague Judge Reinhardt's analysis and his conclusion that these searches violate the Fourth Amendment. First, given the record, I cannot understand how he can proclaim that the "predictability" concern cited by Superintendent Vail seems to be "highly conjectural." This is just a polite way of saying either Superintendent Vail is not credible, or he has bad judgment. Given Judge Bryan's oral findings that (1) Superintendent Vail was a "very credible witness," and (2) "there is no doubt in my mind that there is a valid rational connection between this desire to do *cross-gender* pat searches and the legitimate government interest of security in the prison," (emphasis added). Judge Reinhardt's observation is irreconcilable with the record. His observation glosses over the standard of review we are bound to apply to credibility findings. In *Anderson v. Bessemer*, 470 U.S. 564, 573–575, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985), the Supreme Court mandated "special deference" to such findings, citing Federal Rule of Civil Procedure 52(a): "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Such findings shall be respected by a court of appeals unless "clearly erroneous." In explicating this phrase the Court said:

This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is

convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court.

*Id.* at 573, 105 S.Ct. at 1511. With all respect, Judge Reinhardt's selective treatment of Superintendent Vail's testimony disregards this duty. Furthermore, he fails to acknowledge or contend with the testimony of Mrs. Wood and Director Kincheloe, both of whom linked cross-gender searches to enhanced prison security. Judge Reinhardt's concurrence simply sweeps these chess pieces off the board.

Moreover, Judge Reinhardt lacks a warrant to dismiss as "exaggerated" the importance Superintendent Vail places on the need for searches that are unpredictable. This element has been ventilated by the Supreme Court in *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), and validated as a virtual *sine qua non* of effective prison security against contraband and weapons:

The *uncertainty* that attends random searches of cells renders these searches perhaps *the most effective weapon of the prison administrator in the constant fight against the proliferation of knives and guns, illicit drugs, and other contraband....*

A requirement that even random searches be conducted pursuant to an established plan would seriously undermine the effectiveness of this weapon. It is simply naive to believe that prisoners would not eventually decipher any plan officials might devise for "planned random searches," and thus be able routinely to anticipate searches.... *[W]holly random searches are essential to the effective security of penal institutions.* We, therefore, cannot accept even the concededly limited holding of the Court of Appeals.

*Palmer*, 468 U.S. at 528–29, 104 S.Ct. at 3201–02 (emphasis added). Although the searches under consideration in *Hudson* were of prisoners' cells, the principle of unpredictability so obviously necessary in this environment applies equally to the searches of the other place prisoners harbor contraband: their bodies. It is simply wrong to write off this element of Superintendent Vail's program as illusory. If half the prison officials in WCCW are disqualified from conducting these necessary searches, the advantage goes to the inmates, period. In this respect, I repeat my acceptance of WCCW's gender-balanced workforce.

What all of this means is that in measuring these cross-gender searches objectively under the Fourth Amendment, we *must* credit Superintendent Vail's testimony about their utility in fostering security in WCCW, including the importance of their "unpredictability." If we do so, there is no principled way we can conclude these searches are unreasonable without substituting our judgment for Superintendent Vail's. The Court in *Bell v. Wolfish* counsels against such an arrogation of authority:

[C]ourts have, in the name of the Constitution, become increasingly enmeshed in the minutiae of prison operations. Judges, after all, are human. They, no less than others in our society, have a natural tendency to believe that their individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination.... The wide range of "judgment calls" that meet constitutional and statutory requirements are confided to officials outside the Judicial Branch of Government.

*Bell*, 441 U.S. at 562, 99 S.Ct. at 1886.

There is a reason, of course, why Judge Reinhardt's concurrence must shrug off Superintendent Vail's rationale as "highly conjectural." If his testimony stands, it is a formidable barrier to concluding that these cross-gender searches are unreasonable. Superintendent Vail's testimony gives the cross-gender aspect of these searches a legitimate penological purpose, and Judge Bryan found that purpose to be both valid and rationally connected to a legitimate security interest. Judge Reinhardt is simply wrong when he says, "the

prison's policy of authorizing male guards to conduct suspicionless searches is not supportable on the basis of the stated security considerations." To this, I juxtapose Judge Bryan's written Finding of Fact No. 17:

> 17. There is a rational connection between *the Department of Corrections* [sic] interest to do random and routine *cross-gender* pat searches and the legitimate governmental interest of security in the prison. However, the defendants and their witnesses claimed, but did not prove, that cross-gender searches were necessary for internal security at the Washington Corrections Center for Women. (emphasis added).

Judge Reinhardt essentially echoes Judge Bryan's and Judge O'Scannlain's statements that these searches are not "necessary," citing post preliminary injunction conditions in WCCW as supposed proof of his claim. Setting aside the question of whether the prisoners' alleged (and predictable) post-filing behavior is relevant, the problem with this test is that the Fourth Amendment bans searches which are unreasonable, not those which are unnecessary. "Necessary" means "absolutely required, indispensable." It is a non sequitur to argue that something that is not absolutely required is thereby unreasonable. This "not necessary" approach to the Fourth Amendment is troublesome. It is similar to an argument made by the defendants and rejected by the Supreme Court in *United States v. Martinez–Fuerte:*

> The defendants argue at length that the public interest in maintaining checkpoints is less than is asserted by the Government because the flow of illegal immigrants could be reduced by means other than checkpoint operations. As one alternative they suggest legislation prohibiting the knowing employment of illegal aliens. *The logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.*

*United States v. Martinez–Fuerte,* 428 U.S. 543, 556–57 n. 12, 96 S.Ct. 3074, 3082 n. 12, 49 L.Ed.2d 1116 (1976) (emphasis added).

This observation is certainly correct. Airport magnetometers and x-ray machines and sobriety checkpoints are not absolutely indispensable to combat air piracy and drunk driving, but this per se does not render them unreasonable.

Moreover, Judge Bryan's written Finding of Fact No. 18 makes it clear that the alternatives are not that simple:

> 18. There are ample alternatives to the cross-gender searches, which will meet the security needs of the institution to conduct random and unpredictable body searches of inmates and to conduct mandatory searches at certain locations. Alternative means of achieving the legitimate security goals of the administration include:
>
> > Adjusting corrections officers' scheduling
> >
> > Adjusting corrections officers' job responsibilities
> >
> > Adjusting corrections officers' duties to equalize work load
> >
> > Adjusting collective bargaining agreement
> >
> > Permitting male officers to decide whom to search and having a female do the search
> >
> > Limiting the necessity for an observer
> >
> > Adjusting upward the number of random and routine searches
> >
> > Seeking Bona Fide Occupational Qualifications for certain correction officer positions
> >
> > Using more magnetometers
> >
> > Hiring more staff
> >
> > Keeping inmate population levels reasonable
> >
> > Changing the physical structure and/or layout of the prison
> >
> > Building more women's prisons.

If this list does not enmesh us in the minutiae of running a prison, I do not know what does.

This search issue falls within the "special needs" category, a category that gives greater latitude to the government to con-

duct certain searches than it would ordinarily have under the Fourth Amendment. The operation by a State of a prison is a classic case of circumstances where the "special needs" rule applies. *Griffin v. Wisconsin,* 483 U.S. 868, 873–74, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987); *see also Skinner v. Railway Labor Exec. Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (The government's interest in regulating conduct of employees engaged in safety-sensitive tasks presents special needs justifying a departure from usual Fourth Amendment requirements.); *Bell,* 441 U.S. at 544–60, 99 S.Ct. at 1876–85. In this "special needs" context, I do not view Superintendent Vail's security rationale for cross-gender searches as either exaggerated, irrational, or speculative. Neither did Judge Bryan. The better determinant is that "[i]t is enough to say that [he has] not been conclusively shown to be wrong in this view." *Id.* at 555, 99 S.Ct. at 1882 (quoting *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 132, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977)). The quotation from *Hudson v. Palmer* with which I began this opinion puts all of this in context.

The most difficult and treacherous aspect of this case is knowing what weight to give to the "subjective intrusion" the cross-gender aspect of these searches will have on some prisoners. Both Judge O'Scannlain and Judge Reinhardt have exposed this aspect of the issue with great skill, and it is clear that the degree of "subjective intrusion" these women prisoners experience as a result of being searched by male guards is something to be considered. *See Martinez–Fuerte,* 428 U.S. at 558, 96 S.Ct. at 3083; *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 451–55, 110 S.Ct. 2481, 2486–87, 110 L.Ed.2d 412 (1990). On balance, and after considerable deliberation, I come down on the side of the prison experts. I do so for a combination of reasons previously discussed in this opinion. First, the right against unreasonable searches is not a positive right like those included in the First Amendment. Unlike the practice of religion, for example, the prisoners have no right at all to possess contraband and weapons or to break prison rules. This is a freedom-from, not a freedom-to case. Second, the right of privacy is greatly diminished in the case of prisoners lawfully incarcerated as felons. Third, the problem addressed by these searches is entirely of the making of the prisoners who choose to continue to break the rules and the law even though in prison. Fourth, this decision is best made by "the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers." *Sitz,* 496 U.S. at 454, 110 S.Ct. at 2487. It is not appropriate to sweep away the testimony of Kincheloe, Wood, and Vail as conjectural, speculative, and illusory. This is especially true in view of the Supreme Court's statement that "[w]here a state penal system is involved, federal courts have, as we indicated in [*Procunier v.*] *Martinez,* additional reason to accord deference to the appropriate prison authorities." *Turner,* 482 U.S. at 76, 107 S.Ct. at 2253. If the prison officials' rationale is so transparent and flimsy, one wonders why they stick to it? I conclude from this record that they do so because they believe in good faith they are right.

I close this discussion with this observation: If these searches are not unreasonable, if they pass muster as reasonable searches to control contraband, they surely do not constitute cruel and unusual punishment.

## VII

Now for judicial philosophy. I borrow some thoughts directly from Professor Philip Kurland:

[T]he issue of discretion versus restraint goes to the very heart of constitutionalism. For it is of the essence of constitutionalism that all government—not excepting the courts—is to be contained by established principles. The Justices in espousing the notion that they are the creatures of the higher law and not the creators of it are not indulging myth so much as they are confronting the paradox implicit in constitutional democracy.

The paradox has been described, if not so labeled, by Charles McIlwain:

We live under a written constitution which classifies some things under *jurisdiction,* as legal fundamentals, and thus puts them under the protection of the courts, while it leaves other matters to the free discretion of the organs of positive government it has created. The distribution of these matters between *jurisdiction* and *gubernaculum,* made so many years ago, is of course in constant need of revision by interpretation or by amendment; and it may also be that the mode of amendment is somewhat too slow and cumbersome for the best interests of all.... The long and fascinating story of the balancing of *jurisdiction* and *gubernaculum* ... should be, if we could study it with an open mind, of some help in adjusting and maintaining today the delicate balance of will and law, the central practical problem of politics now as it has been in all past ages. The two fundamental correlative elements of constitutionalism for which all lovers of liberty must yet fight are the legal limits to arbitrary power and a complete political responsibility of government to the governed.

Philip B. Kurland, *Politics, the Constitution and the Warren Court* 8–9 (1970) (quoting Charles McIlwain, *Constitutionalism: Ancient and Modern* 145–46 (rev. ed. 1947)).

Absent a showing of cruel and unusual punishment or searches that are unreasonable, our *jurisdiction* under the Constitution fails. The matter of managing the prison is a question of *gubernaculum.* Justice Holmes warned against straying over this line: "While the courts must exercise a judgment of their own, it by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its ostensible end, or based upon conceptions of morality with which they disagree. Considerable latitude must be allowed for differences of view as well as for possible peculiar conditions which this court can know but imperfectly, if at all." *Otis v. Parker,* 187 U.S. 606,

608–09, 23 S.Ct. 168, 170, 47 L.Ed. 323 (1903).

I respectfully dissent.

WALLACE, Chief Judge, dissenting:

It would, in my judgment, be far better not to permit cross-gender searches on men or women prisoners which involve physical contact or unclothed prisoner viewing. I believe this policy is misguided and hope it will be changed. Nevertheless, this determination is for the political branches. Our role, as a separate and independent branch, is to proscribe such actions only when violative of the Constitution. That is not the case here. Judge Trott's detailed exposition of the record only confirms the panel majority's conclusion: the inmates cannot establish that the prison officials acted with the wantonness necessary to sustain an Eighth Amendment claim. *See Jordan v. Gardner,* 953 F.2d 1137, 1142–44 & n. 3 (9th Cir.1992).

I would merely join in Judge Trott's dissent, but for his tacit acceptance of Judge Reinhardt's analysis of the Fourth Amendment question. That I cannot do and write separately to explain why.

Judge Reinhardt purports to apply the four factor analysis set forth in *Turner v. Safley,* 482 U.S. 78, 89–91, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987) (*Turner*). Yet he consistently adopts a balancing test approach: weighing the strength of the prison officials' justifications for the policy against the invasiveness and harmfulness of the searches to the prisoners. *See, e.g.,* Reinhardt Concurrence at 1535 ("we must ask whether the prison's need to use male guards to conduct the body searches—to the extent that such need exists—outweighs the constitutional injury resulting from the invasiveness of the intrusion"); *id.* at 1537 ("requir[ing] a slight adjustment to guards' work schedules ... is a small price to pay for the preservation of the inmates' fundamental constitutional rights"); *id.* ("minor adjustments ... that the use of female guards would require are relatively insignificant, both in themselves and when weighed against the constitutional interests at stake"); *id.* at 1539 ("While

the prison's penological interest supporting the regulation is minor, the impact of cross-gender searches on the inmates' constitutional rights is substantial"); *id.* at 1540 ("the interests that the superintendent has advanced are insubstantial. They are significantly outweighed by the harm the policy inflicts on the inmates and the injury it does to their constitutional rights").

*Turner* does not authorize such balancing. None of the four factors justifies a court in evaluating the constitutionality of a prison policy by weighing its effects on prisoners against the institutional interests it serves. Judge Reinhardt's balancing test is a departure from the deferential analysis prescribed by *Turner*.

In support of his balancing test approach, Judge Reinhardt relies on *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979) (*Bell*), which explicitly mandated a balancing test in prison search cases. He justifies this step by declaring: "We derive guidance as to how the *Turner* factors are to be applied in 'unreasonable search' cases from *Bell v. Wolfish*." Reinhardt Concurrence at 1540. It is true that *Turner* cites *Bell*. However, *Turner* relies only on that portion of *Bell* that addressed inmates' *First Amendment* claims. *Turner* does not in any way rely on *Bell's Fourth Amendment* balancing approach. *See Turner*, 482 U.S. at 87–90, 107 S.Ct. at 2260–62, *citing Bell*, 441 U.S. at 550–51, 99 S.Ct. at 1880 (upholding prison restrictions on receipt of hardback books by inmates as "a rational response by prison officials to an obvious security problem"), *but not citing Bell*, 441 U.S. at 558–60, 99 S.Ct. at 1884–85 (using balancing test to evaluate Fourth Amendment claims).

*Washington v. Harper*, 494 U.S. 210, 224, 110 S.Ct. 1028, 1037, 108 L.Ed.2d 178 (1990), instructed that *Turner's* four factor analysis is to be applied whenever "the needs of prison administration implicate constitutional rights." None of the *Turner* factors authorizes courts to balance prison officials' institutional needs against the "subjective intrusion" on prisoners entailed by prison policies. It is clear that *Bell's*

Fourth Amendment balancing test does not survive *Turner* and *Harper*.

Although *Turner* does not authorize a balancing test, neither does it require us to ignore either the sufficiency of the reason for a prison policy or the effect of that policy on inmates. The first and fourth *Turner* factors, in particular, require consideration of both the justification for and the effects of a challenged search policy. *See Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2261–62. A highly invasive search policy that is no more effective than a less invasive one may well not pass muster under *Turner*. What *Turner* does not require or permit is for a judge to look at the injury to inmates, on the one hand, and the benefit to prison administration, on the other, and say this one or that one is more important, or weightier, or more worthy of respect, or whatever.

I am also troubled that Judge Trott's Fourth Amendment analysis only incidentally refers to *Turner*. Instead, he seems to accept Judge Reinhardt's balancing approach, only to reach a different result. Judge Trott states that "it is clear that the degree of 'subjective intrusion' these women prisoners experience as a result of being searched by male guards is something to be considered. On balance, and after considerable deliberation, I come down on the side of the prison experts." Trott Dissent at 1565 (citations omitted). He cites *United States v. Martinez–Fuerte*, 428 U.S. 543, 558, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116 (1976), and *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 451–55, 110 S.Ct. 2481, 2486–87, 110 L.Ed.2d 412 (1990), in support of this analysis. But both *Martinez* and *Sitz* are vehicle search cases. This is a prisoner search case, and under *Turner* and *Harper*, prisoner cases are analyzed differently.

Aside from Judge Trott's momentary lapse in not rejecting Judge Reinhardt's incorrect Fourth Amendment analysis, I join in his dissent and adhere to the panel majority opinion.